PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

TCR SPORTS BROADCASTING
HOLDING, L.L.P., d/b/a Mid-
Atlantic Sports Network,

*Petitioner,*

v.

FEDERAL COMMUNICATIONS
COMMISSION; UNITED STATES OF
AMERICA,

*Respondents,*    No. 11-1151

TIME WARNER CABLE
INCORPORATED,

*Intervenor.*

OFFICE OF THE COMMISSIONER OF
BASEBALL; MEDIA ACCESS PROJECT;
ROBERT LITAN; ROBERT HAHN,

*Amici Supporting Petitioner.*

On Petition for Review of an Order
of the Federal Communications Commission.
(FCC 10-202)

Argued: January 26, 2012

Decided: May 14, 2012

Before TRAXLER, Chief Judge, and SHEDD and WYNN,
Circuit Judges.

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Chief Judge Traxler and Judge Shedd concurred.

## COUNSEL

**ARGUED:** David C. Frederick, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, PLLC, Washington, D.C., for Petitioner. Peter Karanjia, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., for Respondents. Jay Cohen, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLC, New York, New York, for Intervenor. **ON BRIEF:** Scott H. Angstreich, Jeffrey M. Harris, KELLOGG, HUBER, HANSEN, TODD, EVANS & FIGEL, PLLC, Washington, D.C., for Petitioner. Christine A. Varney, Assistant Attorney General, Catherine G. O'Sullivan, Nancy C. Garrison, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Richard K. Welch, Acting Associate General Counsel, James M. Carr, FEDERAL COMMUNICATIONS COMMISSION, Washington, D.C., for Respondents. Floyd Abrams, Landis C. Best, CAHILL GORDON & REINDEL LLP, New York, New York; Henk Brands, Andrew W. Croner, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLC, Washington, D.C., for Intervenor. Thomas J. Ostertag, OFFICE OF THE COMMISSIONER OF BASEBALL, New York, New York; Lisa S. Blatt, Robert A. Garrett, R. Stanton Jones, ARNOLD & PORTER LLP, Washington, D.C., for the Office of the Commissioner of Baseball, Amicus Supporting Petitioner. Chrystiane B. Pereira, Andrew Jay Schwartzman, MEDIA ACCESS PROJECT, Washington, D.C., for Media Access Project, Amicus Supporting Petitioner. Arnold M. Weiner, LAW OFFICES OF ARNOLD M. WEINER, Baltimore, Maryland, for Robert Litan and Robert Hahn, Amici Supporting Petitioner.

**OPINION**

WYNN, Circuit Judge:

TCR Sports Broadcasting Holding, L.L.P., d/b/a Mid-Atlantic Sports Network appeals an order of the Federal Communications Commission ("FCC"). Based on a review of its Media Bureau decision and the records below, the FCC found that Time Warner Cable Inc. ("Time Warner") provided legitimate and non-discriminatory reasons for declining to carry Mid-Atlantic Sports Network programming on an analog tier in its North Carolina cable system.

On appeal, Mid-Atlantic Sports Network argues that the FCC's Order should be vacated and remanded because Time Warner engaged in unlawful discrimination, thereby violating Section 536 of the Telecommunications Act of 1934, as amended, and the FCC's program carriage rules. Because the FCC acted neither arbitrarily nor capriciously in rendering its Order, we conclude that the FCC acted within its discretion, and we deny the petition for review and affirm the FCC's Order.

I.

A.

Congress enacted the Cable Television Consumer Protection and Competition Act of 1992 ("the 1992 Cable Act"), Pub. L. No. 102–385, 106 Stat. 1460, which amended the Telecommunications Act of 1934, to address concerns about the possibly anticompetitive effects of the vertical integration of cable companies that own both video distribution facilities and programming content. *See* 47 U.S.C. § 536 (a). To that end, the 1992 Cable Act directed the FCC to promulgate regulations that "govern[ ] program carriage agreements and related practices between cable operators or other multichan-

nel video programming distributors and video programming vendors." 47 U.S.C. § 536 (a).

In October 1993, the FCC established rules to prevent multichannel video programming distributors "from taking undue advantage of programming vendors through various practices, including coercing vendors to grant ownership interests or exclusive distribution rights to multichannel distributors in exchange for carriage on their systems." *Implementation of Sections 12 & 19 of the Cable Tele. Consumer Protect. & Competition Act of 1992 Dev. of Competition & Diversity in Video Programming Distrib. & Carriage, Second Report and Order*, 9 F.C.C. Rcd. 2642, 2643, ¶1 (1993) ("*Program Carriage Order*"); *see also* 47 C.F.R. § 76.1301.

In developing these regulations, the FCC recognized "the congressional intent to prohibit unfair or anticompetitive actions without restraining the amount of multichannel programming available by precluding legitimate business practices common to a competitive marketplace." *Program Carriage Order*, 9 FCC Rcd. at 2643, ¶1. Consequently, the FCC sought to promulgate program carriage rules consistent with the 1992 Cable Act "without unduly interfering with legitimate negotiating practices between multichannel video programming distributors and programming vendors." *Id.*

In July 2006, subject to several conditions, the FCC approved Time Warner's and Comcast Corporation's purchase of Adelphia Communications Corporation's cable systems. *See Applications for Consent to the Assignment and/or Transfer of Control of Licenses, Adelphia Commc'ns Corp., Assignors to Time Warner Cable, Inc., Assignees, et al., Memorandum Opinion & Order*, 21 F.C.C. Rcd. 8203 (2006) ("*Adelphia Order*"). Because the FCC found the transaction had the potential to give Time Warner "an increased incentive to deny carriage to rival unaffiliated [regional sports networks ('RSNs')] with the intent of forcing the RSNs out of business or discouraging potential rivals from entering the market,

thereby allowing [Time Warner] to obtain the valuable programming for its affiliated RSNs," the FCC adopted a condition providing RSNs[1] with an alternative avenue for redress of alleged program carriage violations.[2] *Id.* at 8287, ¶189. Under that condition, in lieu of filing a complaint with the FCC, an RSN unaffiliated with any multichannel video programming distributor that is denied carriage by Time Warner may submit its carriage claim to commercial arbitration within thirty days after that denial. *See id.* at 8287-88, ¶¶190-191.

Further, within thirty days after publication of the arbitration decision, a party may file a petition with the FCC to challenge the arbitrator's award. *Id.* at 8339, Appendix B. The FCC reviews the arbitrator's award de novo and "examine[s] the same evidence that was presented to the arbitrator and . . . choose[s] the final offer of the party that most closely approximates the fair market value of the programming carriage rights at issue." *Id.*

## B.

Mid-Atlantic Sports Network is an unaffiliated RSN that owns the rights to produce and exhibit nearly all of the games of two Major League Baseball franchises—the Baltimore Ori-

---

[1]For purposes of the conditions adopted in the *Adelphia Order*, the FCC defined "regional sports network" ("RSN") to mean, "any non-broadcast video programming service that (1) provides live or same-day distribution within a limited geographic region of sporting events of a sports team that is a member of Major League Baseball, the National Basketball Association, the National Football League, the National Hockey League, NASCAR, NCAA Division I Football, NCAA Division I Basketball and (2) in any year, carries a minimum of either 100 hours of programming that meets the criteria of subheading 1, or 10% of the regular season games of at least one sports team that meets the criteria of subheading 1." *See Adelphia Order*, 21 F.C.C. Rcd. at 8336.

[2]Appendix B of the *Adelphia Order* sets out the program access conditions, remedies under the commercial arbitration, rules of arbitration, and review of arbitration award by the FCC. *See Adelphia Order*, 21 F.C.C. Rcd. at 8336–39, Appendix B, ¶158.

oles and the Washington Nationals. Since its launch, Mid-Atlantic Sports Network has sought program carriage on the networks of multichannel video programming distributors throughout its television territory, which stretches from Pennsylvania to North Carolina.

Time Warner owns multiple cable systems in several states and is the largest provider of pay television service in North Carolina. All of Time Warner's customers subscribe to the "basic" tier, which includes broadcast stations and public access services, and approximately ninety percent of its customers further subscribe to the "cable programming services tier," which includes services such as the Discovery Channel and A&E. J.A. 1034. The basic tier and cable programming services tiers are collectively referred to as the "analog tier." *Id.* As Time Warner has upgraded its cable systems to allow for digital transmission, it has used its digital spectrum to provide a "digital basic tier," which includes a multitude of additional video program services. *Id.* Approximately half of Time Warner's customers are digital basic subscribers.

Among other programming interests, Time Warner is affiliated with News 14, a regional service established by Time Warner in 2002 that provides local news and weather programming. News 14 telecasted games of the Charlotte Bobcats basketball team during the period of Time Warner's negotiations with Mid-Atlantic Sports Network. At the time that Mid-Atlantic Sports Network requested carriage on Time Warner's systems, Time Warner was also affiliated with Turner South, an RSN that held the distribution rights for several professional sports teams, including the Atlanta Thrashers hockey team, the Atlanta Hawks basketball team, and the Atlanta Braves baseball team.

### C.

In March 2005, Mid-Atlantic Sports Network initiated negotiations with Time Warner for program carriage in North

Carolina on an analog tier. During negotiations, Time Warner proposed carriage of Mid-Atlantic Sports Network programming on a digital sports tier or on an analog tier in Time Warner's cable systems only in eastern North Carolina. However, Mid-Atlantic Sports Network wanted program carriage on the statewide analog tier. In May 2007, negotiations broke down.

In June 2007, Mid-Atlantic Sports Network filed an arbitration demand with the American Arbitration Association, pursuant to the procedure established in the *Adelphia Order*. At an arbitration hearing held in May 2008, Mid-Atlantic Sports Network argued that, among other things, in violation of Section 536(a) (a)(3) of the 1992 Cable Act, Time Warner engaged in discrimination by denying Mid-Atlantic Sports Network carriage on Time Warner's statewide analog tier, which Time Warner offered to its affiliated RSNs. On June 2, 2008, the arbitrator issued a Decision and Award in favor of Mid-Atlantic Sports Network, after determining that Mid-Atlantic Sports Network "carried its burden of proof to establish that [Time Warner] treated [Mid-Atlantic Sports Network] differently from [Time Warner's] affiliated RSNs."[3] J.A. 709. The arbitrator found that Mid-Atlantic Sports Network competed with RSNs in which Time Warner has or had ownership interests across its footprint and concluded that in denying program carriage of Mid-Atlantic Sports Network, Time Warner discriminated against Mid-Atlantic Sports Network based on affiliation.

Time Warner, in turn, filed a Petition for Review of the Arbitration Decision and Award with the FCC, defending its decision to decline to carry Mid-Atlantic Sports Network on a statewide analog tier as a legitimate business decision and

---

[3]The first arbitration hearing was held on December 17, 2007, and that arbitrator ruled that Time Warner illegally discriminated on the basis of affiliation in refusing to carry Mid-Atlantic Sports Network. However, Time Warner successfully petitioned to remove the arbitrator after he answered questions from the trade press about the arbitration.

urging the FCC to set aside the ruling.[4] On October 30, 2008, the Media Bureau agreed with Mid-Atlantic Sports Network and affirmed the arbitration Decision and Award on the basis that Time Warner's denial of carriage on an analog tier in North Carolina was discriminatory in violation of the 1992 Cable Act, the FCC's program carriage rules, and the *Adelphia Order*, and that "such discrimination unreasonably restrained the ability of [Mid-Atlantic Sports Network] to compete fairly." J.A. 1039. The Media Bureau ordered Time Warner to launch Mid-Atlantic Sports Network on the analog tier of all of its North Carolina systems within thirty days.

In November 2008, Time Warner filed an Application for Review of the Media Bureau Order before the full FCC.[5] In December 2010, after reviewing the record de novo, the FCC reversed and vacated the Media Bureau Order, concluding that Mid-Atlantic Sports Network had "failed to demonstrate that Time Warner has impermissibly discriminated pursuant to [47 U.S.C. § 536 (a)(3)] and its implementing rules." J.A.

---

[4]Although the *Adelphia Order* directs that review of the arbitration award be by the FCC itself, that body has delegated this function to the FCC Media Bureau pursuant to 47 U.S.C. § 155(c)(1): "When necessary to the proper functioning of the Commission and the prompt and orderly conduct of its business, the Commission may, by published rule or by order, delegate any of its functions [subject to certain exceptions] to a panel of commissioners, an individual commissioner, an employee board, or an individual employee, including functions with respect to hearing, determining, ordering, certifying, reporting, or otherwise acting as to any work, business, or matter."

[5]Pursuant to the *Adelphia Order*, the FCC may not hold another evidentiary hearing or allow the parties to adduce new evidence. *See Adelphia Order*, 21 F.C.C. Rcd. at Appendix B § B.4c. ("In reviewing the award, the Commission will examine the same evidence that was presented to the arbitrator and will choose the final offer of the party that closely approximates the fair market value of the programming carriage rights at issue."). However, a decision by the Media Bureau is not binding upon the FCC, which retains certain authorities for itself. *See* 47 U.S.C. § 155(c)(6) ("If the Commission grants the application for review, it may . . . set aside the order [or] decision. . . .").

1065. The FCC found that very few cable subscribers in North Carolina were interested in watching the games of professional teams from Baltimore and Washington. The FCC further found that Time Warner would incur costs of approximately $10 million per year if it carried Mid-Atlantic Sports Network. Additionally, the FCC found that, unlike the carriage of the Time Warner affiliate News 14 Charlotte Bobcats games, which did not require a separate channel or cost any additional money, the carriage of Mid-Atlantic Sports Network would necessitate two new analog channels and an additional charge of sixty cents per subscriber per month.

Moreover, the FCC noted that Time Warner did not completely refuse to carry Mid-Atlantic Sports Network under any circumstances but instead offered to carry Mid-Atlantic Sports Network on a digital tier. The FCC concluded that Time Warner had provided legitimate and non-discriminatory reasons for rejecting Mid-Atlantic Sports Network's carriage proposal. Mid-Atlantic Sports Network now petitions this Court to vacate the FCC's Order and remand the case to the FCC with instructions for the FCC to issue a final decision within sixty days.

## II.

### A.

When assessing the reasonableness of the FCC's decision, the Administrative Procedure Act ("APA") requires this Court to affirm the decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(a). "Review under this standard is highly deferential, with a presumption in favor of finding the agency action valid." *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009). Moreover, "[i]n conducting our review under the APA, 'we perform only the limited, albeit important, task of reviewing agency action to determine whether the agency conformed with controlling statutes, and

whether the agency has committed a clear error of judgment.'" *Hodges v. Abraham*, 300 F.3d 432, 449 n.17 (4th Cir. 2002) (quoting *Md. Dep't of Human Res. v. U.S. Dep't of Agric.*, 976 F.2d 1462, 1475 (4th Cir. 1992)).

## B.

We first address Mid-Atlantic Sports Network's contention that the FCC erroneously credited Time Warner's post hoc justifications for what Mid-Atlantic Sports Network characterizes as Time Warner's discriminatory refusal to carry Mid-Atlantic Sports Network. Specifically, Mid-Atlantic Sports Network attacks the admissibility of the sworn statements of Carol Hevey, Time Warner's Executive Vice President of Operations for North Carolina, and Brian Kelly, a Time Warner executive who reports to Hevey, as post hoc justifications invented for the purpose of litigation.[6] We find that even if the statements post-dated the initiation of this litigation, the FCC reasonably credited the sworn statements and testimonies of Hevey and Kelly.

---

[6]To bolster this argument, Mid-Atlantic Sports Network relies on several employment discrimination cases: *EEOC v. Sears Roebuck & Co.*, 243 F.3d 846, 853 (4th Cir. 2001); *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 359-60 (1995); and *Price Waterhouse v. Hopkins*, 490 U.S. 228, 252 (1989). These cases are, however, distinguishable from the case at bar. In *Sears*, the defendant "offered different justifications at different times." 243 F.3d at 852. Unlike the defendant in *Sears*, Time Warner has not offered differing explanations for its decision. Instead, Time Warner has maintained that it denied Mid-Atlantic Sports Network analog carriage throughout North Carolina because the costs of carriage exceeded the benefits.

Nor is this a situation in which Time Warner's asserted reason for its decision did not actually "motivate it at the time of the decision," *Price Waterhouse*, 490 U.S. at 252, or in which it is impossible for the defendant to have acted for the reason it offered, *see McKennon,* 513 U.S. at 352, 359-60 (1995) (observing that because employee's "misconduct was not discovered until after she had been fired," employer "could not have been motivated by knowledge it did not have" at the relevant time).

In her sworn declaration, Hervey recounted that she and her staff "took into account the cost of [Mid-Atlantic Sports Network's] programming." J.A. 144. Hevey projected that if Time Warner had agreed to pay the rights demanded by Mid-Atlantic Sports Network, i.e., sixty cents per subscriber per month, cable bills would have increased for the majority of cable subscribers, and Time Warner would have had to pay Mid-Atlantic Sports Network "almost $10 million per year" for analog coverage, despite that [Mid-Atlantic Sports Network] would not likely generate enough revenue to cover this rights fee. J.A. 547. Hevey's testimony also reflected that Time Warner considered the opportunity costs associated with analog carriage of Mid-Atlantic Sports Network, including that because Time Warner lacked vacant channels on its analog tiers in North Carolina, carriage of Mid-Atlantic Sports Network on an analog tier would require Time Warner to delete existing programming services.

In another sworn declaration, Brian Kelly confirmed that he, Hevey, and other Time Warner employees "participated in numerous discussions" concerning the weak demand in North Carolina for Mid-Atlantic Sports Network's telecasts of Orioles and Nationals baseball games. J.A. 344. They concluded that there was "relatively little interest in the Orioles" in North Carolina "and even less in the Nationals." J.A. 344-45. When Kelly "personally made inquiries concerning the ratings" for Fox Sports South's North Carolina telecasts of Orioles games in past seasons, he discovered that those "ratings were low." J.A. 345.

Contrary to Mid-Atlantic Sports Network's argument challenging these statements as being impermissible post hoc justifications, the decisions of our sister circuits, in discrimination cases, persuasively guide us to decline to read significance solely into the timing of a defendant's explanation or the absence of contemporaneous evidence. *See, e.g.*, *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir. 1990) (rejecting argument that an employer's reasons for not

promoting an employee "lack[ed] credibility" because they "were not documented until after the commencement of" litigation); *Adeyemi v. District of Columbia*, 525 F.3d 1222, 1228 (D.C. Cir. 2008) ("declin[ing] to find any significance in the timing of [the defendant's] explanation" or "the absence of contemporaneous evidence," and rejecting plaintiff's argument that the defendant had "manufactured its justifications after the fact"). Accordingly, we find that the FCC reasonably credited Hevey's and Kelly's uncontradicted testimony.

Mid-Atlantic Sports Network also asserts that Time Warner failed to "produce a single contemporaneous document supporting even one of [the reasons offered by Hevey], mak[ing] it implausible (at best) that these were truly the factors motivating [Time Warner's] decision." Pet'r's Br. at 45. Time Warner counters that it supplied a contemporaneous email exchange between two Time Warner employees, Mickey Carter and Tom Smith, buttressing Time Warner's sworn testimony that the limited demand for Mid-Atlantic Sports Network programming played a key role in Time Warner's rejection of Mid-Atlantic Sports Network's proposal. Nonetheless, Mid-Atlantic Sports Network contends that the contemporaneous email exchange provides no credible evidence of the actual reasons why Time Warner Cable refused to carry its programming on an analog channel.

The referenced document, a copy of an August 2006 email exchange between two Time Warner employees, Mickey Carter and Tom Smith, reads in pertinent part:

> CARTER: Do your systems in Eastern North Carolina receive Fox Sports South? If so, do you receive any Baltimore Orioles games on Fox Sports South?
>
> SMITH: We are in the Baltimore footprint and have NO Baltimore fans to speak of. There is a HUGE Atlanta fan base here, we have no way to deliver what they want . . . .

CARTER: Your feedback has been very helpful — my gut has been that your market can't have many Oriole fans.

J.A. 201-02.

This contemporaneous documentary evidence is consistent with Time Warner's sworn testimonial evidence that there was limited demand for Orioles games in North Carolina. Accordingly, this e-mail exchange bolsters the unrefuted sworn statements of Hevey and Kelly that the limited demand for Orioles games in North Carolina played a key role in Time Warner's decision-making. Moreover, all such evidence underscores that the FCC's conclusion that Time Warner's business justifications provided a legitimate non-discriminatory reason for denying Mid-Atlantic Sports Network carriage on its statewide analog tier was not unreasonable, capricious, or otherwise unlawful.

Additionally, contrary to Mid-Atlantic Sports Network's assertion, the lack of documentation corroborating Time Warner defenses does not undermine the FCC Order. The FCC directly addressed this issue and noted that "there is nothing in [1992 Cable Act] or its implementing rules requir[ing] program carriage defendants to memorialize any aspect of their decision making process." J.A. 1076. The FCC also noted it did not find any evidence in the record "that cable operators typically document their internal carriage discussions." *Id.* Accordingly, "the absence of contemporaneous evidence is hardly unusual," *Adeyemi*, 525 F.3d at 1228, and that it does not seem unusual for a company to "wait[ ] to memorialize the reasons" for a challenged decision until after litigation is commenced. *Merrick*, 892 F.2d at 1438. Therefore, we conclude that the FCC reasonably accepted Time Warner's sworn testimony in the absence of contemporaneous evidence to rebut allegations of program carriage discrimination.

Mid-Atlantic Sports Network also asserts that the FCC made factual findings not supported by substantial evidence,

specifically key findings regarding demand for Mid-Atlantic Sports Network's programming, the high cost of Mid-Atlantic Sports Network carriage, and limited channel capacity for analog coverage of Mid-Atlantic Sports Network. This Court "must affirm" such findings "as long as they are supported by substantial evidence on the record as a whole." *NLRB v. Grand Canyon Mining Co.*, 116 F.3d 1039, 1043-44 (4th Cir. 1997) (internal quotation marks and citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *NLRB v. HQM of Bayside, LLC*, 518 F.3d 256, 260 (4th Cir. 2008) (internal quotation marks and citation omitted).

Here, contrary to Mid-Atlantic Sports Network's assertion, the record contains substantial evidence supporting the FCC's findings regarding Time Warner's business justifications for denying Mid-Atlantic Sports Network statewide analog tier carriage. Specifically, the sworn statements of Hevey and Kelly, as well as the e-mail exchange between Carter and Smith, along with other evidence in the record, support the FCC's findings regarding demand for Mid-Atlantic Sports Network's programming, the high cost of carriage, and limited channel capacity for analog coverage of Mid-Atlantic Sports Network's programming. Accordingly, we must affirm those findings.

C.

We next consider Mid-Atlantic Sports Network's argument that it made an indisputable prima facie showing of program-carriage discrimination by showing that Time Warner treated Mid-Atlantic Sports Network less favorably than its affiliated RSNs. Mid-Atlantic Sports Network asserts that, after it established a prima facie discrimination case, the burdens of production and persuasion shifted to Time Warner to show legitimate and non-discriminatory reasons for its carriage decision.

In its Order, the FCC acknowledged that the "weight of the evidence resides with [Time Warner]." J.A. 1067 n.58. Even assuming that the burdens of production and persuasion had shifted to Time Warner, the FCC explained that Time Warner prevailed because it succeeded in showing legitimate, non-discriminatory reasons for its carriage decision. This aspect of the FCC's decision is consistent with the language of the 1992 Cable Act and the FCC's corresponding regulation, *see* 47 C.F.R. § 76.1301(c), and also with "the congressional intent to prohibit unfair or anticompetitive actions without . . . precluding legitimate business practices common to a competitive marketplace." *See Program Carriage Order*, 9 F.C.C. Rcd. at 2643, ¶1.

Mid-Atlantic Sports Network has failed to show that, even assuming that it made a prima facie discrimination case, Time Warner did not effectively rebut that case with evidence supporting legitimate, non-discriminatory business reasons for its denial of statewide analog tier carriage, or that the analytical framework applied by the FCC to its decision in this regard was erroneous.

D.

Finally, Mid-Atlantic Sports Network argues that the FCC's Order will harm competition and consumers.

The FCC's program carriage rules broadly prohibit multichannel video programming distributors from "engag[ing] in conduct the effect of which is to unreasonably restrain the ability of an unaffiliated programming vendor to compete fairly" by discriminating against such vendor "on the basis of affiliation or nonaffiliation." 47 C.F.R. § 76.1301(c). In implementing the program carriage rules, the FCC opted to deal with discrimination claims on a case-by-case basis, which would best meet Congress's goal of ensuring that "legitimate business practices" fuel competition, leading to "greater availability of programming to the multichannel

video marketplace." *See Program Carriage Order*, 9 F.C.C. Rcd. at 2648, ¶15. The FCC determined that dealing with claims on a case-by-case basis would best meet Congress' goal of ensuring that "legitimate business practices" fuel competition, leading to "greater availability of programming to the multichannel video marketplace." *Id.*

This case was evaluated individually, and it was determined that "legitimate business practices common to a competitive marketplace," *id.*, underpinned Time Warner's decision to deny statewide analog tier carriage. The FCC concluded that the "high cost of carriage" of Mid-Atlantic Sports Network was a "legitimate and non-discriminatory" reason for its refusal to carry Mid-Atlantic Sports Network on a statewide analog tier. J.A. 1075. Additionally, the FCC found that Time Warner was willing to negotiate with Mid-Atlantic Sports Network over digital carriage programming throughout North Carolina, as well as an analog tier programming in eastern North Carolina. Mid-Atlantic Sports Network rejected those proposals, which would have provided access of Mid-Atlantic Sports Network's programming to Time Warner subscribers. Accordingly, we find the evidence supports the FCC's determination that Time Warner's decision was "driven by factors other than a desire to force [Mid-Atlantic Sports Network] out of business or discourage [Mid-Atlantic Sports Network] from entering the market." J.A. 1077. Therefore, we find that Mid-Atlantic Sports Network has failed to show how such legitimate business decisions harm competition or consumers.

## III.

In sum, with its Order, the FCC acted neither arbitrarily nor capriciously nor otherwise unlawfully. We therefore deny the petition for review and affirm the FCC Order.

*AFFIRMED*