Opinion for the Court filed by Senior Circuit Judge WILLIAMS.
Concurring opinion filed by Circuit Judge KAVANAUGH.
Concurring opinion filed by Senior Circuit Judge EDWARDS.
WILLIAMS, Senior Circuit Judge:
Regulations of the Federal Communications Commission, adopted under the mandate of § 616 of the Communications Act of 1934 and virtually duplicating its language, bar a multichannel video programming distributor (“MVPD”) such as a cable company from discriminating against unaffiliated programming networks in decisions about content distribution. More specifically, the regulations bar such conduct when the effect of the discrimination is to “unreasonably restrain the ability of an unaffiliated video programming vendor to compete fairly.” 47 C.F.R. § 76.1301(c); see also 47 U.S.C. § 536(a)(3). Tennis Channel, a sports programming network and intervenor in this suit, filed a complaint against petitioner Comcast Cable, an MVPD, alleging that Comcast violated § 616 and the Commission’s regulations by refusing to broadcast Tennis as widely (i.e., via the same relatively low-priced “tier”) as it did its own affiliated sports programming networks, Golf Channel and Versus. (Versus is now known as NBC Sports Network and was originally called Outdoor Life Network; for consistency with the order under review, we refer to it as “Versus.”) An administrative law judge ruled against Comcast, ordering that it *984 provide Tennis carriage equal to what it affords Golf and Versus, and the Commission affirmed. See Tennis Channel, Inc. v. Comcast Cable Commc’ns, LLC, Memorandum Opinion and Order, 27 FCC Red. 8508, 2012 WL 3039209 (July 24, 2012) (“Order”).
Comcast’s arguments on appeal are, broadly speaking, threefold. First, it contends that Tennis’s complaint was untimely filed under 47 C.F.R. § 76.1302(h), given the meaning that the Commission apparently assigned that section when it last modified its language. See In re Implementation of the Cable Television Consumer Protection and Competition Act of 1992, 9 FCC Red. 4415, ¶ 24, 1994 WL 414309 (Aug. 5, 1994). Judge Edwards’s concurring opinion addresses that issue. The panel need not do so, as the limitations period doesn’t constitute a jurisdictional barrier. And as Judge Edwards notes, the Commission has launched a rulemaking apparently aimed in part at clearing up the confusion he identifies. In re Revision of the Commission’s Program Carriage Rules, 26 FCC Red. 11494, 11522-23, ¶¶ 38-39, 2011 WL 3279328 (Aug. 1, 2011).
Second, Comcast poses a number of issues as to the meaning of § 616, including an argument that the Commission reads it so broadly as to violate Comcast’s free speech rights under the First Amendment. We need not reach those issues, as Com-cast prevails with its third set of arguments—that even under the Commission’s interpretation of § 616 (the correctness of which we assume for purposes of this decision), the Commission has failed to identify adequate evidence of unlawful discrimina^tion.
Many arguments within this third set involve complex and at least potentially sophisticated disputes. See, e.g., Order ¶¶ 71-74 (relating to calculation of “penetration rates” for purposes of determining whether Comcast treated Tennis more or less favorably than did other MVPDs and of measuring the degree of harm caused by any such difference). But Comcast also argued that the Commission could not lawfully find discrimination because Tennis offered no evidence that its rejected proposal would have afforded Comcast any benefit. If this is correct, as we conclude below, the Commission has nothing to refute Comcast’s contention that its rejection of Tennis’s proposal was simply “a straight up financial analysis,” as one of its executives put it. Joint Appendix (“J.A.”) 300.
Comcast, the largest MVPD in the United States, offers cable television programming to its subscribers in several different distribution “tiers,” or packages of programming services, at different prices. Since Versus’s and Golfs launches in 1995, Comcast—which originally had a minority interest in the two networks, and now has 100% ownership—has generally carried the networks on its most broadly distributed tiers, Expanded Basic or the digital counterpart Digital Starter. Order ¶ 12; J.A. 1223-24.
Tennis Channel, launched in 2003, initially sought distribution of its content on Comcast’s less broadly distributed sports tier, a package of 10 to 15 sports networks that Comcast’s subscribers can access for an extra $5 to $8 per month. In 2005, Tennis entered a carriage contract that gave the Comcast the “right to carry” Tennis “on any ... tier of service,” subject to exclusions irrelevant here. Comcast in fact placed Tennis on the sports tier.
In 2009, however, Tennis approached Comcast with proposals that Comcast reposition Tennis onto a tier with broader distribution. Order ¶¶ 12, 33. Tennis’s proposed agreement called for Comcast to pay Tennis for distribution on a per-subscriber basis. Tennis provided a detailed *985 analysis—which is sealed in this proceeding—of what Comcast would likely pay for that broader distribution; even with the discounts that Tennis offered, the amounts are substantial. Neither the analysis provided at the time, nor testimony received in this litigation, made (much less substantiated) projections of any resulting increase in revenue for Comcast, let alone revenue sufficient to offset the increased fees.
Comcast entertained the proposal, checking with “division and system employees to gauge local and subscriber interest.” J.A. 402. After those consultations, and based on previous analyses of interest in Tennis, Comcast rejected the proposal in June 2009. Tennis then filed its complaint with the Commission in January 2010, which led to the order now under review. By way of remedy, the ALJ ordered, and the Commission affirmed, that Comcast must “carry [Tennis] on the same distribution tier, reaching the same number of subscribers, as it does [Golf] and Versus.” Order ¶ 92.
The parties agree that Comcast distributes the content of affiliates Golf and Versus more broadly than it does that of Tennis. The question is whether that difference violates § 616 and the implementing regulations. There is also no dispute that the statute prohibits only discrimination based on affiliation. Thus, if the MVPD treats vendors differently based on a reasonable business purpose (obviously excluding any purpose to illegitimately hobble the competition from Tennis), there is no violation. The Commission has so interpreted the statute, Mid-Atlantic Sports Network v. Time Warner Cable Inc., 25 FCC Red. 18099, ¶ 22 (2010), and the Commission’s attorney conceded as much at oral argument, see Oral Arg. Tr.
at 24-25; see also TRC Sports Broad. Holding L.L.P. v. FCC, 679 F.3d 269, 274-77 (4th Cir.2012) (discussing the legitimate, non-discriminatory reasons for an MVPD’s differential treatment of a non-affiliated network).
In contrast with the detailed, concrete explanation of Comcast’s additional costs under the proposed tier change, Tennis showed no corresponding benefits that would accrue to Comcast by its accepting the change. Testimony from one of Com-cast’s executives identifies some of the factors it considers when deciding whether to move a channel to broader distribution:
In deciding whether to carry a network and at what cost, Comcast Cable must balance the costs and benefits associated with a wide range of factors, including: the amount of the licensing fees (which is generally the most important factor); the nature of the programming content involved; the intensity and size of the fan base for that content; the level of service sought by the network; the network’s carriage on other MVPDs; the extent of [most favored nation][1] protection provided; the term of the contract sought; and a variety of other operational issues.
J.A. 408, ¶32. Of course the record is very strong on the proposed increment in licensing fees, in itself a clear negative. The question is whether the other factors, and perhaps ones unmentioned by Com-cast, establish reason to expect a net benefit.
But neither Tennis nor the Commission offers such an analysis on either a qualitative or a quantitative basis. Instead, the best the Commission offers, both in the Order and at oral argument, is that Tennis charges less per “rating point” than does *986 either Golf or Versus. Order ¶ 78 n. 243; Oral Arg. Tr. at 25-29. But those differentials are not affirmative evidence that acceptance of Tennis’s 2009 proposal could have offered Comcast any net gain. Even if we were to assume arguendo that low charges per ratings point are the be-all and the end-all of assigning a network to a broadly accessible tier (and the record does not support such an assumption), the cost-per-ratings-point evidence would at most show that (by this particular criterion) Tennis’s gross cost is not as high as that of either Golf or Versus. It does not show any affirmative net benefit. As to the assumption about cost per ratings point, the sealed record suggests (consistent with Comcast’s evidence about the factors guiding its tier placement decisions) that a very high price per rating point is by no means an absolute barrier to placement in a broadly available tier. J.A. 51,1112.
In the absence of evidence that the lower cost per ratings point is correlated with changes in revenues to offset the proposed cost increase for Tennis’s broader distribution, the discussion of cost per ratings point is mere handwaving.
A rather obvious type of proof would have been expert evidence to the effect that X number of subscribers would switch to Comcast if it carried Tennis more broadly, or that Y number would leave Comcast in the absence of broader carriage, or a combination of the two, such that Comcast would recoup the proposed increment in cost. There is no such evidence. (Conceivably Tennis could have shown that the incremental losses from carrying Tennis in a broad tier would be the same as or less than the incremental losses Comcast was incurring from carrying Golf and Versus in such tiers. The parties do not even hint at this possibility, nor analyze its implications.)
Not only does the record lack affirmative evidence along these lines, there is evidence that no such benefits exist. After Tennis proposed the broader distribution of its content on Comcast’s network, Com-cast executives surveyed employees in various geographic divisions to gauge interest in the proposal. The executive in charge of the northern division reported that there was “[n]o interest whatsoever” in moving Tennis to a broader distribution, J.A. 349, because there had never been “a request or a complaint to move Tennis Channel to a more available tier,” id. at 350. Perhaps more telling is the natural experiment conducted in Comcast’s southern division. There Comcast had in 2007 or 2008 acquired a distribution network from another MVPD that had distributed Tennis more broadly than did Comcast. When Comcast repositioned Tennis to the sports tier (a “negative repo” in MVPD lingo), thereby making it available to Com-cast’s general subscribers only for an additional fee, not one customer complained about the change.
When we asked at oral argument about the absence of evidence of benefit to Com-cast from the proposed tier change, Commission counsel pointed not to any such evidence but to the ALJ’s remedy (affirmed by the Commission), which gave Comcast the alternative of narrowing the exposure of Golf and Versus (rather than broadening that of Tennis). Such a change was the Commission’s alternative remedy for bringing the three networks to tiering parity. But the discriminatory act alleged by the Commission was Comcast’s refusal to broaden its distribution of Tennis, not a refusal to narrow its distribution of Golf and Versus. The latter may make complete sense in terms of providing an evenhanded remedy. But evidence that such a change would have afforded Com-cast a net benefit—for example, by generating incremental sports tier fees exceed *987 ing incremental losses from the removal of Golf and Versus from lower priced tiers— would in itself have little bearing on the lawfulness of Comcast’s rejection of Tennis’s actual proposal to extend distribution of the latter’s content. It is thus unsurprising that no one organized data to test the profitability of this hypothetical tiering change.
This is not to say that the record lacks evidence of important similarities between Tennis on the one hand and Golf and Versus on the other. See, e.g., Order ¶¶ 51-55. If accompanied by evidence that (assuming Golf and Versus had been on the sports tier at the time of Tennis’s proposal in 2009) a shift of them to broader coverage would have yielded incremental revenue equivalent to what Tennis demanded in 2009, the comparative data might have done the job. But no such evidence was offered.
Neither Tennis nor the Commission has invoked the concept that an otherwise valid business consideration is here merely pretextual cover for some deeper discriminatory purpose. Instead, both Tennis and the Commission challenge Comcast’s cost-benefit analysis as insufficiently rigorous. While Tennis and the Commission both label that analysis “pretextual,” see Tennis Br. at 18; Resp’ts’ Br. at 31, their actual claim is that the cost-benefit analysis was too hastily performed to justify Comcast’s rejection of Tennis’s proposal, thus supporting an inference that discrimination was the true motive. In light of the evidence surveyed above, and the lack of evidence from which one might infer any net benefit, Comcast’s haste is irrelevant.
We note that the FCC’s Media Bureau found that Tennis had established a prima facie case and that the Commission assumed without deciding that in those circumstances Tennis retained the burden of proof throughout the proceeding. Order ¶ 38. We will assume arguendo, in favor of the Commission, that the Media Bureau was correct in its finding of a prima facie case and that in those circumstances it could shift the burden to the respondent. But that assumption is of no use to the Commission where the record simply lacks material evidence that the Tennis proposal offered Comcast any commercial benefit.
Without showing any benefit for Com-cast from incurring the additional fees for assigning Tennis a more advantageous tier, the Commission has not provided evidence that Comcast discriminated against Tennis on the basis of affiliation. And while the Commission describes at length the “substantial evidence” that supports a finding that the discrimination is based on affiliation, Resp’ts’ Br. at 25-31, none of that evidence establishes benefits that Comcast would receive if it distributed Tennis more broadly. On this issue the Commission has pointed to no evidence, and therefore obviously not to substantial evidence. See Guardian Moving & Storage Co., Inc. v. ICC, 952 F.2d 1428, 1433 (D.C.Cir.1992).
The petition is therefore

Granted.

. A “most favored nation” provision grants the distributor "the right to be offered any more favorable rates, terms, or conditions subsequently offered or granted by a network to another distributor.” J.A. 1376.