KAVANAUGH, Circuit Judge,
concurring:
I join the Court’s fine opinion in full. I add this brief separate opinion simply to note that the FCC also invoked the principle of constitutional avoidance to support its result here. In my view, the Commisr sion was right to perceive a serious First Amendment problem with the Viewability Rule.
In its Order allowing the Viewability Rule to sunset, the FCC explained that “dramatic changes in technology and the marketplace” since the adoption of the Viewability Rule in 2007 had rendered “less certain the constitutional foundation for an inflexible rule compelling carriage of broadcast signals in both digital and analog formats.” Carriage of Digital Television Broadcast Signals, Fifth Report and Order, 27 FCC Red. 6529, 6537 (2012). As a result of those dramatic marketplace changes, the FCC concluded that it could no longer justify “imposing a rigid analog-carriage requirement on cable operators, where the record establishes a reasonable, less burdensome alternative that meets the statutory objectives.” Id.
The dramatically changed marketplace that the Commission aptly recognized in this case undermines the constitutional foundation of the Viewability Rule and, indeed, of the broader must-carry regime as well. In the Cable Television Consumer Protection and Competition Act of 1992, Congress imposed many significant restrictions — including ' the must-carry regime — that infringe on cable operators’ “editorial discretion over which stations or programs” to carry. Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 636, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (Turner I) (quoting Los Angeles v. Preferred Communications, Inc., 476 U.S. 488, 494, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986)); see Cable Act of 1992, Pub.L. No. 102-385, 106 Stat. 1460. The Supreme Court upheld the must-carry requirements against a First Amendment challenge only after determining that must-carry advanced “important governmental interests unrelated to the suppression of free speech” and did “not burden substantially more speech than necessary to further those interests.” Turner Broadcasting System, Inc. v. FCC, 520 U.S. 180, 189, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (Turner II) (applying “intermediate scrutiny”).
Turner identified the important governmental interest underlying the regulations as the interest in counteracting the effects of monopoly. And Turner rested its approval of the must-carry regime on the fact that cable operators in the early 1990s possessed “bottleneck monopoly power.” Turner I, 512 U.S. at 661, 114 S.Ct. 2445; see Cable Act of 1992, § 2(a)(2) (finding “undue market power for the cable operator”). Only because of the “real threat” that cable operators would exploit their monopoly power and discriminate unfairly against disfavored or unaffiliated broadcasters did the Court approve Congress’s dictate forcing cable operators to carry the signals of certain preferred broadcasters. Turner II, 520 U.S. at 196, 117 S.Ct. 1174 (controlling opinion of Kennedy, J.).
Things have changed. In the two decades since Congress enacted the Cable Act of 1992, the video programming marketplace has radically transformed. Cable *414 operators today face intense competition from a burgeoning number of satellite, fiber optic, and Internet television providers — none of whom are saddled with the same program carriage and non-discrimination burdens that cable operators bear. As this Court has flatly stated, cable operators “no longer have the bottleneck power over programming that concerned the Congress in 1992.” Comcast Corp. v. FCC, 579 F.3d 1, 8 (D.C.Cir.2009); see also Comcast Cable Communications, LLC v. FCC, 717 F.3d 982, 992-94 (D.C.Cir.2013) (Kavanaugh, J., concurring); Cablevision Systems Corp. v. FCC, 597 F.3d 1306, 1316 (D.C.Cir.2010) (Kavanaugh, J., dissenting); Randolph J. May, Charting a New Constitutional Jurisprudence for the Digital Age, 3 Charleston L.Rev. 373, 393-94 (2009); Christopher S. Yoo, Vertical Integration and Media Regulation in the New Economy, 19 Yale J. On Reg. 171, 229 (2002); Note, Enabling Television Competition in a Converged Market, 126 Harv. L.Rev. 2083 (2013); R. Matthew Warner, Note, Reassessing Turner and Litigating the Must-Carry Law Beyond a Facial Challenge, 60 Fed. Comm. L.J. 359 (2008).
Unsurprisingly, cable regulations adopted in the era of Cheers and The Cosby Show are ill-suited to a marketplace populated by Homeland and House of Cards. And the constitutional problems infecting the 1992 Cable Act’s various program carriage and non-discrimination requirements grow more significant every day, as new video programming distributors emerge and prosper. The upshot is that the cable “bottleneck monopoly” on which Turner rested no longer exists— and, as a result, the Act’s infringements on cable operators’ editorial discretion no longer can withstand First Amendment scrutiny.
Turner’s conclusion was expressly based on the state of the marketplace in the early 1990s. See Turner II, 520 U.S. at 197-207, 117 S.Ct. 1174 (controlling opinion of Kennedy, J.). Contrary to petitioners’ suggestion to this Court, a Supreme Court decision that says, in essence, “Because there is now a monopoly, this regulation is permissible” does not mean “Even when there is no monopoly, this regulation is permissible.” Cf. Time Warner Cable Inc. v. FCC, 729 F.3d 137, 161 (2d Cir.2013). Suppose the Supreme Court considers an antitrust case and concludes that Company X has an 80 percent market share, that anything over 50 percent constitutes market power in that market, and that it is unlawful under the antitrust laws for a company such as Company X with market power to engage in certain activities. In a future case, a lower court would be bound by vertical stare decisis to say that a company with a market share over 50 percent in the relevant market had market power and thus could not lawfully engage in those activities. But if Company X’s market share in the relevant market declined to 10 percent — meaning that it no longer had market power — a lower court would obviously not be bound to hold that Company X still could not engage in those activities. So it is here. A contrary approach to precedent in these circumstances would reflect a mindless perversion of stare decisis, not a faithful application of stare decisis.
When the cable operators’ monopoly collapsed, the constitutional foundation supporting the 1992 Cable Act’s program carriage and non-discrimination regimes collapsed with it. Stare decisis requires courts (and, in the first instance, the FCC) to carefully and faithfully follow the constitutional principles that undergird Turner: First, “cable operators engage in and transmit speech, and they are entitled to the protection of the speech and press provisions of the First Amendment.” Turner I, 512 U.S. at 636, 114 S.Ct. 2445. And second, absent a finding of market *415 power, the Government may not infringe on the cable operators’ editorial discretion. See id. at 661, 114 S.Ct. 2445. Applying those principles to today’s highly competitive video programming distribution marketplace leads to an entirely different result than it did 20 years ago. Because cable operators no longer wield market power, the Government can no more tell a cable operator today which video programming networks it must carry than it can tell a bookstore what books to sell or tell a newspaper what columnists to publish.
In short, as a matter of constitutional law and technological reality, the 1992 Cable Act’s various program carriage and non-discrimination regimes rest on a hollowed-out foundation. The Commission was right to see the First Amendment problem in this case — and further cases like this no doubt loom on the horizon. With that observation, I join the opinion of the Court.