11-4138(L)
Time Warner Cable Inc. v. FCC

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: October 4, 2012     Decided: September 4, 2013)

Docket Nos. 11-4138(L), 11-5152(Con)

TIME WARNER CABLE INC., NATIONAL CABLE & TELECOMMUNICATIONS ASSOCIATION,

*Petitioners*,

—v.—

FEDERAL COMMUNICATIONS COMMISSION, UNITED STATES OF AMERICA,

*Respondents*.

Before:

RAGGI, CHIN and CARNEY, *Circuit Judges*

Petitions for review of a 2011 Order of the Federal Communications Commission promulgating rules under § 616(a)(3) and (5) of the Communications Act of 1934, as amended by the Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460 (1992) (codified at 47 U.S.C. § 536(a)(3), (5)). Petitioners contend that the prima facie standard established by the 2011 Order, as well as § 616(a)(3) and (5) pursuant to which it was promulgated, violate the First Amendment. They further assert that the 2011 Order's standstill rule was promulgated in violation of the Administrative

Procedure Act's notice-and-comment requirements.  See 5 U.S.C. § 553(b), (c).  We reject

the first argument, but are persuaded by the second.

PETITIONS DENIED IN PART AND GRANTED IN PART, AND FCC ORDER VACATED IN PART.

———————

FLOYD ABRAMS (Marc Lawrence-Apfelbaum, Jeff Zimmerman, Time Warner Cable Inc., New York, New York; Richard P. Press, Matthew A. Brill, Amanda E. Potter, Matthew T. Murchison, Latham & Watkins LLP, Washington, D.C.; Landis C. Best, Ari Melber, Cahill Gordon & Reindel, New York, New York, *on the brief*), Cahill Gordon & Reindel, New York, New York, *for Petitioner Time Warner Cable Inc*.

MIGUEL A. ESTRADA (Rick Chessen, Neal M. Goldberg, Michael S. Schooler, Diane B. Burstein, National Cable & Telecommunications Association, Washington, D.C.; Cynthia E. Richman, Scott P. Martin, Gibson, Dunn & Crutcher LLP, Washington, D.C.; Howard J. Symons, Tara M. Corvo, Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., Washington, D.C., *on the brief*), Gibson, Dunn & Crutcher LLP, Washington, D.C., *for Petitioner National Cable & Telecommunications Association*.

PETER KARANJIA, Deputy General Counsel (Joseph F. Wayland, Acting Assistant Attorney General, Catherine G. O'Sullivan, Nancy C. Garrison, United States Department of Justice, Washington, D.C.; Sean A. Lev, General Counsel, Jacob M. Lewis, Associate General Counsel, James M. Carr, Counsel, Federal Communications Commission, Washington, D.C., *on the brief*), Federal Communications Commission, Washington, D.C. *for Respondents Federal Communications Commission and United States of America*.

Stephen Díaz Gavin, Andrew M. Friedman, Patton Boggs LLP, Washington, D.C., *for Amicus Curiae Bloomberg L.P.*

Erin L. Dozier, Jane E. Mago, Jerianne Timmerman, The National Association of Broadcasters, Washington, D.C., *for Amicus Curiae The National Association of Broadcasters*.

Harold Feld, Senior Vice President, Sherwin Siy, Vice President, Legal Affairs, Public Knowledge, Washington, D.C., *for Amicus Curiae Public Knowledge*.

C. William Phillips, Covington & Burling LLP, New York, New York; Stephen A. Weiswasser, Kurt A. Wimmer, Gerard J. Waldron, Neema D. Trivedi, Covington & Burling LLP, Washington, D.C., *for Amici Curiae The Tennis Channel, Inc. & NFL Enterprises LLC*.

REENA RAGGI, *Circuit Judge*:

Time Warner Cable Inc. ("Time Warner") and the National Cable & Telecommunications Association ("NCTA" and, collectively with Time Warner, the "Cable Companies") petition for review of an August 1, 2011 order of the Federal Communications Commission ("FCC" or "Commission").[1] See Revision of the Commission's Program Carriage Rules, 26 FCC Rcd. 11494 (2011) ("2011 FCC Order"). The 2011 FCC Order promulgates rules under § 616(a)(3) and (5) of the Communications Act of 1934 ("Communications Act"), as amended by the Cable Television Consumer Protection and Competition Act of 1992, Pub. L. No. 102-385, 106 Stat. 1460 (1992) ("Cable Act") (codified at 47 U.S.C. § 536(a)(3), (5)). Section 616(a)(3) and (5) and that part of the 2011 FCC Order establishing the standard for demonstrating a prima facie violation of these statutory provisions (collectively, the "program carriage regime") are intended to curb

---

[1] Although the NCTA's membership does not consist solely of cable companies, we refer to the NCTA and Time Warner collectively as "Cable Companies" throughout the opinion for ease of reference. Respondents FCC and the United States have submitted a joint brief to the court. Thus, references throughout this opinion to the FCC's arguments on appeal should be understood to incorporate the position of the United States as well.

anticompetitive behavior by limiting the circumstances under which a distributor of video programming can discriminate against unaffiliated networks that provide such programming. The Cable Companies contend that, on its face, the program carriage regime violates their First Amendment right to free speech. See U.S. Const. amend. I. They further argue that the 2011 FCC Order's standstill rule—which requires a distributor to continue carrying an unaffiliated network under the terms of its preexisting contract until the network's complaint against the distributor under the program carriage regime is resolved—was promulgated in violation of the notice-and-comment requirements of the Administrative Procedure Act ("APA"). See 5 U.S.C. § 553(b), (c).

For the reasons set forth in this opinion, we reject the Cable Companies' First Amendment challenge to the program carriage regime. At the same time, however, we conclude that the challenged standstill rule was not promulgated in accordance with the APA. Accordingly, the Cable Companies' petitions are denied in part and granted in part, and the 2011 FCC Order's standstill rule is vacated without prejudice to the FCC's pursuing promulgation consistent with the APA.

## I.    **Background**

### A.    The Video Programming Industry

To provide context for our discussion of the legal issues raised by the Cable Companies, we begin with an overview of the video programming industry and its relevant terminology. As pertinent to this case, the video programming industry includes video

4

programming vendors, multichannel video programming distributors ("MVPDs"), and online video distributors ("OVDs"). See Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming, No. 12-203, 2013 WL 3803465, ¶¶ 2–6, 9–11 (July 22, 2013) ("2013 FCC Report"); Annual Assessment of the Status of Competition in the Market for the Delivery of Video Programming, 27 FCC Rcd. 8610, ¶¶ 2–6, 9–11, 18, 42 (2012) ("2012 FCC Report").[2]

Video programming vendors are primarily programming networks, such as ESPN, Bravo, and CNN, which create or acquire video programming, such as television shows and movies, and which contract with MVPDs and OVDs to distribute that programming to consumers. See 47 C.F.R. § 76.1300(e) (defining "[v]ideo programming vendor"); 2012 FCC Report ¶¶ 18–19, 44, 238, 244–248, Table B-1. MVPDs and OVDs are services that transmit video programming to subscribers for viewing on televisions, computers, and other electronic devices. See 47 C.F.R. § 76.1300(d) (defining "[m]ultichannel video programming distributor"); 2012 FCC Report ¶¶ 2 n.6, 9, 18–19, 21, 237–39. MVPDs and OVDs generally do not alter the programming that they transmit; rather, once an MVPD or OVD acquires programming from networks, it functions as a "conduit for the speech of

---

[2] Following the release of the 2011 FCC Order, in July 2012 and July 2013, the FCC released its most recent reports on the state of competition in the video programming industry. The 2012 FCC Report reviews industry data from 2007–2010, see 2012 FCC Report ¶ 1, while the 2013 FCC Report reviews data from 2011–2012, see 2013 FCC Report ¶ 1.

others, transmitting it on a continuous and unedited basis to [consumers]." Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 629 (1994) ("Turner I"); see 2012 FCC Report ¶ 238.

MVPDs include (1) cable operators, such as Time Warner and Comcast Corporation ("Comcast"), which transmit programming over physical cable systems; (2) direct broadcast satellite ("DBS") providers, such as DISH Network and DIRECTV, which transmit programming via direct-to-home satellite; and (3) telephone companies, such as AT&T and Verizon, which transmit programming via fiber-optic cable. See 2012 FCC Report ¶¶ 18, 30.[3] While MVPDs primarily transmit programming to televisions, increasingly, they also offer access to their programming through the Internet. See id. ¶¶ 6, 21. MVPDs sometimes acquire ownership interests in the networks from which they obtain video programming, and vice versa. See id. ¶ 42. Such networks are deemed "affiliated" with MVPDs, whereas networks without any shared ownership interests are deemed "unaffiliated." Id. ¶¶ 42–43. The "geographic footprint[]" of an MVPD varies based on the type and size of the MVPD. Id. ¶ 24. Cable operators, for instance, operate in "discrete geographic areas defined by the boundaries of their individual systems," id., and "[n]o cable operator provides nationwide coverage or statewide coverage," 2013 FCC Report ¶ 25. Telephone companies are similarly limited by their physical systems. See id. ¶ 28. By contrast, DBS providers have "national

_____

[3]As of June 2012, the top five MVPDs in terms of total subscribers were, from largest to smallest: Comcast, DIRECTV, DISH Network, Time Warner, and Cox Communications. See 2013 FCC Report ¶¶ 25, 27, 70, 97.

footprints," id. ¶ 23, offering "service to most of the land area and population of the United States," id. ¶ 27.

OVDs, like Hulu and Netflix, are relatively new services that transmit video programming to consumers via broadband Internet for viewing on television and other electronic devices.[4] See 2012 FCC Report ¶¶ 2 n.6, 9, 237–39, 246, 252–53. OVDs may offer programming for free, by subscription, on a rental basis, or for sale. See id. ¶¶ 10, 245–46, 252–53. "[A]n OVD's market generally covers the entire national broadband footprint." Id. ¶ 243; see 2013 FCC Report ¶ 220.

Two markets in the video programming industry are relevant to this case. The first, which we will refer to as the "video programming market," is the market in which programming networks and other video programming vendors compete with each other to have MVPDs and OVDs carry their video programming. See 2012 FCC Report ¶¶ 9, 11; 2011 FCC Order ¶ 4 & nn.10–12. The second market, which we will refer to as the "MVPD market," consists of MVPDs and, to a lesser extent, OVDs competing to deliver video programming to consumers. See 2012 FCC Report ¶¶ 3–6, 9, 11; 2011 FCC Order ¶ 4 & n.13. See generally Cablevision Sys. Corp. v. FCC, 597 F.3d 1306, 1319 (D.C. Cir. 2010) (Kavanaugh, J., dissenting) (citing Christopher S. Yoo, Vertical Integration & Media Regulation in the New Economy, 19 YALE J. ON REG. 171, 220 (2002), and discussing chain of production in video programming industry).

---

[4] OVDs do not include MVPDs that offer their subscribers access to their programming through the Internet. 2012 FCC Report ¶ 2 n.6.

B.      The Cable Act

In 1992, after three years of hearings, Congress overrode President George H.W. Bush's veto and enacted the Cable Act to regulate the video programming industry. At the time, cable operators held 95% of the MVPD market in the United States. See Implementation of Cable Television Consumer Protection & Competition Act of 1992, 17 FCC Rcd. 12124, ¶ 20 (2002) ("2002 FCC Report"). Nascent MVPD systems, such as DBS and fiber-optic telephone systems, did not then pose a significant competitive threat to cable operators, see 2012 FCC Report ¶ 27; S. Rep. No. 102-92, at 8 (1991), reprinted in 1992 U.S.C.C.A.N. 1133, 1140–41, and OVDs did not yet exist, see 2012 FCC Report ¶ 239. Cable operators also generally did not compete against one another in any given locality, see 2012 FCC Report ¶¶ 27, 39, due in part to "local franchising requirements and the extraordinary expense of constructing more than one cable television system to serve a particular geographic area," Cable Act § 2(a)(2). Thus, the country was effectively divided into numerous local cable monopolies, with few consumers having a choice of MVPDs. See id.; S. Rep. No. 102-92, at 8, reprinted in 1992 U.S.C.C.A.N. at 1141 ("A cable system serving a local community, with rare exceptions, enjoys a monopoly.").

In conjunction with their local monopolies, cable operators exercised "bottleneck" control, a power that allowed them to prevent certain programming networks from reaching consumers in particular geographic areas. Turner I, 512 U.S. at 656–57. It is the "physical connection between the [subscriber's] television set and the cable network" that affords cable

8

operators this power to "silence the voice" of a particular network "with a mere flick of the switch." Id. at 656 (observing that "simply by virtue of its ownership of the essential pathway for cable speech, a cable operator [could] prevent its subscribers from obtaining access to programming it [chose] to exclude"); see generally 3B P. Areeda & H. Hovenkamp, Antitrust Law ¶¶ 771a, 772a (3d ed. 2008) (discussing bottleneck control and essential facilities doctrine in antitrust context).

Concerns about cable operators' anticompetitive market power informed Congress's enactment of the Cable Act. See Turner I, 512 U.S. at 633–34; Cable Act § 2(a) (listing congressional findings about video programming industry). Among other goals, the Act sought to promote the availability to the public of diverse views through cable television, to protect consumer interests where cable operators were not subject to effective competition, and to ensure that cable operators did not have undue market power vis-à-vis programming networks and consumers. See Cable Act § 2(b). Toward these ends, the Cable Act imposed various restrictions on cable operators and other MVPDs and directed the FCC to establish further regulations. See Turner I, 512 U.S. at 630. The focus of this appeal is certain statutory restrictions on MVPDs dealings with programming networks and the FCC regulations promulgated thereunder, namely, the program carriage regime and the standstill rule.

C.    The Program Carriage Regime and the Standstill Rule

1.    Section 616(a)(3) and (5)

As amended by the Cable Act, § 616(a) of the Communications Act directs the FCC to "establish regulations governing program carriage agreements and related practices between cable operators or other [MVPDs] and video programming vendors."  47 U.S.C. § 536(a).  Section 616(a)(3) specifies that such regulations shall

> contain provisions designed to prevent [an MVPD] from engaging in conduct the effect of which is to unreasonably restrain the ability of an unaffiliated video programming vendor to compete fairly by discriminating in video programming distribution on the basis of affiliation or nonaffiliation of vendors in the selection, terms, or conditions for carriage of video programming provided by such vendors.

Id. § 536(a)(3).  Section 616(a)(5) further instructs that such regulations shall "provide for appropriate penalties and remedies for violations of this subsection, including carriage." Id. § 536(a)(5).

Congress enacted these provisions to prevent cable operators from using their market power to take unfair advantage of unaffiliated programming networks.  See 2012 FCC Report ¶ 42.  As the Senate and House Reports indicate, Congress was concerned that cable operators were leveraging "their market power derived from their de facto exclusive franchises and lack of local competition" to require networks to give them "an exclusive right to carry the programming, a financial interest, or some other added consideration as a condition of carriage on the cable system."  S. Rep. No. 102-92, at 24, reprinted in 1992 U.S.C.C.A.N. at 1156–57; see H.R. Rep. No. 102-628, at 42–44 (1992); 2012 FCC Report

10

¶ 42. The Senate Report notes that such tactics were "not surprising" in light of the lack of competition in the MVPD market: unaffiliated networks either had to "deal with operators of such systems on their terms or face the threat of not being carried in that market." S. Rep. No. 102-92, at 24, reprinted in 1992 U.S.C.C.A.N. at 1157. The report acknowledged aspects of the MVPD and video programming markets that could sometimes offset or reduce these anticompetitive concerns. See id. For example, the extent of cable operators' market power varied from locality to locality. See id. Moreover, certain major networks, like CNN and ESPN, could "fend for themselves," as cable operators were unlikely not to carry such popular networks given the operators' incentive to carry programming that "increase[d] subscribership and decrease[d] churn." Id. Nevertheless, Congress remained concerned that "in certain instances" a cable operator would be able to "abuse its locally-derived market power to the detriment of programmers." Id.; see H.R. Rep. No. 102-628, at 43–44.

This concern was exacerbated by pervasive vertical integration in the video programming industry. "Vertical integration occurs when a firm provides for itself some input that it might otherwise purchase on the market." Areeda & Hovenkamp ¶ 755a. "A vertically integrated cable company is a company that owns both the programming and the distribution system." S. Rep. No. 102-92, at 24–25, reprinted in 1992 U.S.C.C.A.N. at 1157–58. In 1992, when the Cable Act was enacted, 39 of the 68 national programming networks, or approximately 57%, were vertically integrated with cable operators. See H.R. Rep. No. 102-628, at 41; see also 2012 FCC Report ¶ 42. This vertical integration provided

11

cable operators with the incentive and ability to favor their affiliated networks, for example, by giving an affiliated network a more desirable channel position than an unaffiliated network or by refusing to carry an unaffiliated network altogether.  See S. Rep. No. 102-92, at 25, reprinted in 1992 U.S.C.C.A.N. at 1158; H.R. Rep. No. 102-628, at 41.  Indeed, the Senate Report noted hearing testimony that stated as much:

> Because of the trend toward vertical integration, cable operators now have a clear vested interest in the competitive success of some of the programming services seeking access through their conduit.  You don't need a Ph.D. in Economics to figure out that the guy who controls a monopoly conduit is in a unique position to control the flow of programming traffic to the advantage of the program services in which he has an equity investment and/or in which he is selling advertising availabilities, and to the disadvantage of those services . . . in which he does not have an equity position.

S. Rep. No. 102-92, at 25–26, reprinted in 1992 U.S.C.C.A.N. at 1158–59 (internal quotation marks omitted); see also Areeda & Hovenkamp ¶ 756b (stating that vertically-integrated monopolist "at one stage of the production-distribution process may carry with it the power to affect competition in earlier and later stages").

On the other hand, Congress recognized that vertical integration could sometimes promote competition.  See S. Rep. No. 102-92, at 26–27, reprinted in 1992 U.S.C.C.A.N. at 1159–60; H.R. Rep. No. 102-628, at 41.  The Senate Report cited hearing testimony recounting how vertical integration had allowed cable operators to "stimulate[] the development of programming that was necessary to flesh out the promise of cable . . . when nobody else was really willing to step up and put up the money."  S. Rep. No. 102-92, at 27, reprinted in 1992 U.S.C.C.A.N. at 1160; see also Areeda & Hovenkamp ¶ 756b ("[V]ertical

integration by a monopolist may or may not have desirable or adverse consequences on economic performance.").

Given these mixed views on the competitive impact of vertical integration in the video programming industry, Congress rejected proposals to ban vertical integration and instead enacted "legislation bar[ring] cable operators from discriminating against unaffiliated programmers" to ensure "competitive dealings between programmers and cable operators." S. Rep. No. 102-92, at 27, reprinted in 1992 U.S.C.C.A.N. at 1160; see also H.R. Rep. No. 102-628, at 173 ("While vertical integration of cable systems has led to a diversity of program offerings which had previously been unknown, we cannot countenance discriminatory practices by cable systems in favor of program suppliers in which the cable company has an interest.").

### 2. The 1993 FCC Order

Pursuant to the Cable Act's mandate, on October 22, 1993, the FCC released an order establishing a procedural framework for addressing § 616(a)(3) discrimination complaints by unaffiliated networks against MVPDs. See Implementation of Sections 12 & 19 of the Cable Television Consumer Protection & Competition Act of 1992, 9 FCC Rcd. 2642 (1993) ("1993 FCC Order"). In so doing, the FCC sought to establish regulations that balanced the need to proscribe "behavior prohibited by the specific language of the statute" with the need to preserve "the ability of affected parties to engage in legitimate, aggressive negotiations." Id. ¶ 14. It thus determined that resolution of § 616(a)(3) complaints would be case specific,

13

focusing "on the specific facts pertaining to each negotiation" to determine if a violation of the program carriage rules had occurred. Id.

Under the 1993 FCC Order's complaint process, an unaffiliated network, as a first step to obtaining relief against an MVPD, had to make a prima facie "showing that [the MVPD] . . . engaged in behavior that is prohibited by" § 616(a)(3). Id. ¶ 29. To carry its prima facie burden, the unaffiliated network had to, among other things, "identify the relevant Commission regulation allegedly violated," "describe with specificity the behavior constituting the alleged violation," and provide documentary evidence of the alleged violation or an affidavit setting forth the basis for its allegations. Id. Defendant MVPDs were permitted to file an answer supported by documentary evidence or a refuting affidavit, to which the complainant could then reply. See id. ¶ 30. If, upon FCC review of these submissions, the agency determined that the complainant had not shown a prima facie violation, the complaint would be dismissed. See id. ¶ 31. But if a prima facie violation were shown, the FCC could order discovery, refer the case to an administrative law judge ("ALJ") for a hearing, or, if appropriate, grant relief on the basis of the existing record. See id.

Pursuant to § 616(a)(5), the 1993 FCC Order also established penalties for violations of § 616(a)(3), which included forfeitures, mandatory carriage, or carriage on terms revised or specified by the FCC. See id. ¶ 26. The FCC emphasized that appropriate relief would be decided on a "case-by-case basis." Id.

14

### 3. The 2007 FCC Notice of Proposed Rule Making

On June 15, 2007, the FCC issued a notice of proposed rule making that solicited comments on potential changes to the procedures established in the 1993 FCC Order. See Leased Commercial Access; Development of Competition & Diversity in Video Programming Distribution & Carriage, 22 FCC Rcd. 11222 (2007) ("2007 NPRM"). Among other things, the FCC sought comment on the need to clarify the elements of a prima facie § 616(a)(3) violation, see id. ¶ 14, and to "adopt rules to address the complaint process itself," id. ¶ 16. As to the latter point, the FCC requested comments both on whether it "should adopt additional rules to protect [programming networks] from potential retaliation if they file a complaint" and whether "the existing penalties for frivolous program carriage complaints are appropriate or should be modified." Id. The FCC also solicited comment "on any other issues that would properly inform [its] program carriage inquiry." Id. ¶ 18.

### 4. The 2011 FCC Order

Some four years later, on August 1, 2011, the FCC released the 2011 FCC Order here at issue. In so doing, the FCC noted the small number of § 616(a)(3) complaints filed against MVPDs pursuant to the 1993 Order. See 2011 FCC Order ¶ 6 n.27 (noting total of 11 program carriage complaints in approximately two decades since 1992 enactment of § 616). MVPDs submitted that the small number "demonstrate[d] that the current procedures [were] working and that rule changes [were] not necessary." Id. ¶ 8. By contrast, programming networks complained that "inadequate" agency procedures, "not a lack of program carriage

15

claims," id., "hindered the filing of legitimate complaints," id. ¶ 2. Networks specifically cited "uncertainty concerning the evidence a complainant must provide to establish a prima facie case, unpredictable delays in the Commission's resolution of complaints, and fear of retaliation as impeding the filing of legitimate program carriage complaints." Id. ¶ 8 (footnotes omitted).

The FCC concluded that the record developed in response to the 2007 NPRM showed that its "current program carriage procedures [were] ineffective and in need of reform." Id. ¶ 8. Accordingly, in the 2011 FCC Order, the agency stated that it was taking "initial steps to improve [its] procedures for addressing program carriage complaints." Id. ¶ 2. Among these steps were two rule changes relevant to the petitions for this court's review: (a) pronouncement of a new prima facie standard, and (b) creation of a standstill rule.

### a. *Prima Facie* Standard

The 2011 FCC Order rejected comments calling for elimination of a prima facie standard, concluding that such a required showing "is important to dispose promptly of frivolous complaints and to ensure that only legitimate complaints proceed to further evidentiary proceedings." Id. ¶ 10. At the same time, however, the Order strove to "clarify[] what is required to establish a prima facie case and [to] codify[] these requirements in [the FCC's] rules." Id.

Under the revised standard for a prima facie § 616(a)(3) violation, a complaining unaffiliated network must show, first, that an MVPD discriminated against it "on the basis

16

of affiliation or non-affiliation" in the "selection, terms, or conditions for carriage" of the MVPD's video programming. Id. ¶ 14 (internal quotation marks omitted). The network can make this showing by reference to either direct or circumstantial evidence. See id. ¶¶ 13–14; 47 C.F.R. § 76.1302(d)(3)(iii)(B). In the latter case, circumstances must establish that (1) the complaining unaffiliated network "provides video programming that is similarly situated to video programming provided by" a network affiliated with the defendant MVPD, "based on a combination of factors, such as genre, ratings, license fee, target audience, target advertisers, target programming, and other factors," 2011 FCC Order ¶ 14 (footnotes omitted); see 47 C.F.R. § 76.1302(d)(3)(iii)(B)(2)(i); and (2) the complained-of MVPD treated the unaffiliated network differently than the similarly-situated, affiliated network "with respect to the selection, terms, or conditions for carriage," 2011 FCC Order ¶ 14; see 47 C.F.R. § 76.1302(d)(3)(iii)(B)(2)(ii). This similarly-situated analysis at the prima facie stage is conducted on a "case-by-case" basis with no single factor being dispositive. 2011 FCC Order ¶ 14 n.57. Rather, "the more factors that are found to be similar, the more likely the programming in question will be considered similarly situated to the affiliated programming." Id. ¶ 14.

To demonstrate a prima facie violation, a complainant must further show that the discrimination had the effect of "unreasonably restraining" its ability "to compete fairly." Id. ¶ 15 (internal quotation marks omitted); see 47 C.F.R. § 76.1302(d)(3)(iii)(A). This analysis is also case specific, and the 2011 FCC Order noted that, in previous cases, the FCC

17

Media Bureau had made this assessment based on the impact of the charged adverse action "on the programming vendor's subscribership, licensee fee revenues, advertising revenues, ability to compete for advertisers and programming, and ability to realize economies of scale." 2011 FCC Order ¶ 15 n.60.

The 2011 FCC Order clarified that the Media Bureau would review only an unaffiliated network's complaint in making a prima facie violation determination, see id. ¶ 17, and that the prima facie burden did not require the complainant to prove a § 616(a)(3) violation or any elements thereof, but that it did require the complainant to "provide[] sufficient evidence in its complaint, without the Media Bureau having considered any evidence to the contrary, to proceed." Id. ¶ 16. If the complainant carries this prima facie burden, the Media Bureau will then review the MVPD's answer and complainant's reply thereto to determine whether the merits of the complaint can be resolved on the pleadings, or whether further proceedings, such as discovery or an adjudicatory hearing before an ALJ, are warranted. See id. ¶ 17.

b.      Standstill Rule

In addition to revising the prima facie standard, the 2011 FCC Order created a standstill rule, which allows the FCC to consider requests for a "temporary standstill of the price, terms, and other conditions of an existing programming contract by a program carriage complainant seeking renewal of such a contract." Id. ¶ 25; see 47 C.F.R. § 76.1302(k). In adopting this provision, the FCC concluded that, "absent a standstill, an MVPD will have the

18

ability to retaliate against a programming vendor that files a legitimate complaint by ceasing carriage of the programming vendor's video programming, thereby harming the programming vendor as well as viewers who have come to expect to be able to view that video programming." 2011 FCC Order ¶ 25. Furthermore, it found that, without a standstill, "programming vendors may feel compelled to agree to the carriage demands of MVPDs, even if these demands violate the program carriage rules, in order to maintain carriage of video programming in which they have made substantial investments." Id.

To secure a standstill order, a complainant must satisfy the traditional criteria for a preliminary injunction, demonstrating (1) likely success on the merits of the complaint; (2) that it will face irreparable harm absent a standstill; (3) no substantial harm to other interested parties; and (4) the standstill's furtherance of the public interest. See id. ¶ 27; 47 C.F.R. § 76.1302(k)(1).

In pronouncing the standstill rule, the FCC rejected a general complaint by cable operators following the 2007 NPRM, i.e., that the agency had failed to provide adequate notice under the APA of the rule changes that it was considering. See 2011 FCC Order ¶ 36 & n.146. The FCC concluded that the APA's notice-and-comment requirements did not apply to the standstill rule because it is a rule of agency procedure, rather than of substance. See id. ¶ 36 n.149 (stating that standstill rule does "not alter the existence or scope of any substantive rights, but simply codif[ies] a pre-existing procedure for obtaining equitable relief to vindicate those rights"). In any event, the FCC concluded that the 2007 NPRM

complied with APA requirements because the standstill rule is the "logical outgrowth" of the 2007 NPRM's solicitation for comments on whether the FCC should "'adopt additional rules to protect programmers from potential retaliation if they file a complaint.'" Id. ¶ 36 (quoting 2007 NPRM ¶ 16 and noting that "standstill procedure will help to prevent retaliation while a program carriage complaint is pending").

Nevertheless, the 2011 FCC Order sought additional comment on "whether there are any circumstances in the program carriage context in which the Commission's authority to issue temporary standstill orders is statutorily or otherwise limited." Id. ¶ 60. In particular, it requested comment on whether § 624(f)(1) of the Communications Act, see 47 U.S.C. § 544(f)(1) (stating that FCC "may not impose requirements regarding the provision or content of cable services, except as expressly provided in this subchapter"), would "bar granting temporary injunctive relief in the program carriage context in some circumstances," 2011 FCC Order ¶ 26 n.107 (emphasis in original).

Dissenting in part from the 2011 FCC Order, Commissioner Robert McDowell concluded that the APA's notice-and-comment requirements did apply to the standstill rule because that rule "confer[s] substantive rights" and is "outside the scope of Commission procedure" insofar as it "extends a contractual arrangement and determines the amount of compensation parties will receive after the program carriage dispute is resolved." Id. at 11610 (Commissioner McDowell, approving in part and dissenting in part). He further rejected the majority view that the standstill rule codifies the FCC's past practice in the

20

program carriage context. See id. Indeed, he questioned FCC authority to issue a standstill order before finding an MVPD in violation of program carriage rules. See id. In support, he cited § 616(a)(5) of the Cable Act, see 47 U.S.C. § 536(a)(5), which permits the FCC to impose penalties and remedies, such as ordering program carriage, only upon a violation, and § 624(f)(1) of the same Act, see id. § 544(f)(1), which, as just described supra, prohibits the FCC from imposing requirements regarding the provision or content of cable services beyond those provided by statute. See 2011 FCC Order at 11610 & n.15. To reinforce his conclusion, Commissioner McDowell noted that the FCC had expressly solicited comments on the adoption of a standstill rule when promulgating rules under the program access provision of the Cable Act, see 47 U.S.C. § 548. See 2011 FCC Order at 11611.

He further dissented from the majority conclusion that the 2007 NPRM satisfied the APA's notice-and-comment requirements, explaining that because the "standstill arrangements were not discussed in the 2007 notice, . . . interested parties were not aware that comments should [have been] filed on the subject during the notice-and-comment period." Id. at 11609. "In fact, the idea of a standstill provision was not raised by any parties submitting initial comments. Instead, the matter was advanced after the close of the comment period." Id.; see id. at 11609 n.9. Moreover, Commissioner McDowell found the relationship between retaliation and the standstill rule to be "tenuous at best" and, thus, that the rule could not be deemed a logical outgrowth of the FCC's notice regarding anti-retaliation rules. Id. Finally, he stated that the 2011 FCC Order's adoption of the

standstill rule was curious in light of the fact that it simultaneously sought comment on several key aspects of the rule's implementation, notably possible statutory limits on the FCC's authority to issue a standstill order in the program carriage context. See id. at 11611 & n.19. Commissioner McDowell therefore predicted that the standstill rule was "vulnerable to a court remand." Id. at 11609.

### 5. Time Warner's First Amendment Challenge

In releasing the 2011 FCC Order, the agency rejected Time Warner's claim, made in response to the 2007 NPRM, that the program carriage regime violated the First Amendment. See id. ¶¶ 31–34. Time Warner had argued that, insofar as the program carriage regime required MVPDs to carry certain unaffiliated networks on the same terms as affiliated networks, it constituted a content-based infringement on MVPDs' editorial determinations of which programming networks to provide to their subscribers. As such, it was subject to strict scrutiny, which Time Warner maintained it could not withstand because increased competition in the MVPD market had deprived cable operators of any bottleneck power that might have justified the regime's initial creation in 1992. See id. ¶¶ 31, 33; Comments of Time Warner Cable Inc., MB Docket No. 07-42, at 10–13 (Sept. 11, 2007).

Construing the program carriage regime as content neutral, the FCC applied intermediate, rather than strict, scrutiny to Time Warner's First Amendment challenge, and concluded that, even with the increased competition in the MVPD market, the program carriage regime continued to serve important government interests in promoting competition

and diverse viewpoints.  See 2011 FCC Order ¶¶ 32–33.  In so concluding, the FCC relied on the program carriage discrimination provision of the Cable Act that "directed the Commission to assess on a case-by-case basis the impact of anticompetitive conduct on an unaffiliated programming vendor's ability to compete."  Id. ¶ 33.  It further noted that the overall number of affiliated networks had increased significantly following the 2011 merger of Comcast—the nation's largest cable operator and MVPD—and NBC Universal, the nation's fourth largest owner of national programming networks.  See id.; Applications of Comcast Corp., General Electric Co. & NBC Universal, Inc. For Consent to Assign Licenses & Transfer Control of Licensees, 26 FCC Rcd. 4238, ¶ 116 (2011) ("2011 Comcast/NBCU Order").  Although the FCC had approved this merger, see 2011 Comcast/NBCU Order, the agency maintained that it "highlight[ed] the continued need for an effective program carriage complaint regime," 2011 FCC Order ¶ 33.[5]

_____

[5]As a result of its merger with NBC Universal, and following its sale of 17 networks to non-MVPDs, as of June 2012, Comcast had an ownership interest in 50 national networks, as well as numerous regional news and sports networks.  See 2013 FCC Report ¶ 39, Table B-1, Table C-1; 2012 FCC Report ¶ 45.

In approving the merger, the FCC expressed concern that Comcast's incentive and ability to harm unaffiliated networks would thereby increase:

Comcast's large subscriber base potentially allows it to limit access to customers for any network it wishes to disadvantage by either denying carriage or, with a similar but lesser competitive effect, placing the network in a less penetrated tier or on a less advantageous channel number (making it more difficult for subscribers to find the programming).  In doing so, Comcast can reduce viewership of competing video programming networks, which in turn could render these networks less attractive to advertisers, thus reducing their

The FCC further concluded that case-by-case analysis of unaffiliated networks' complaints under the program carriage regime was narrowly tailored to promote diversity and competition in the video programming industry because it restricted an MVPD's speech only upon proof that the MVPD had discriminated on the basis of network affiliation and that such discrimination unreasonably restrained a network's ability to compete fairly. See id. ¶ 34.

D.      The Current State of the Video Programming Industry

As the 2011 FCC Order acknowledges, the video programming industry has changed significantly since enactment of the Cable Act in 1992. While cable operators still control a majority of the United States MVPD market, their share of that market has dropped from 95% in 1992, see 2002 FCC Report ¶ 20, to 55.7% as of June 2012, see 2013 FCC Report ¶ 3. This decline is attributable to the concomitant rise of DBS providers, which now command 33.6% of the MVPD market, and telephone companies, which now control an estimated 9.1% of that market. See id. ¶ 3 & n.6. Indeed, at the end of June 2012, two DBS providers, DIRECTV and DISH Network, were the second and third largest MVPDs in the United States, respectively, in terms of total subscribers. See id. ¶ 27. Given the national

---

revenues and profits. As a result, these unaffiliated networks may compete less aggressively with NBCU networks, allowing the latter to obtain or . . . maintain market power with respect to advertisers seeking access to their viewers.

2011 Comcast/NBCU Order ¶ 116. These concerns led the FCC to condition the merger on Comcast's agreement to certain restrictions aimed at reducing affiliation-based discrimination, in addition to those imposed by the program carriage regime. See id. ¶¶ 121–24.

footprint of DBS providers, in most geographic areas served by a cable operator, consumers now have a choice among three competing MVPDs, specifically, the local cable operator and two DBS providers. Meanwhile, a significant number of geographic areas have access to at least four MVPDs: the local cable operator, two DBS providers, and a telephone company. See id. ¶ 36 (stating that, in 2011, of 132.5 million homes in the United States, approximately 130.7 million had access to at least three MVPDs and approximately 46.8 million had access to at least four).

Consumers also increasingly have been watching video programming through OVDs. See 2012 FCC Report ¶ 140; 2011 Comcast/NBCU Order ¶¶ 63–66, 79. In June 2012, approximately 180 million Internet users in the United States watched online video content, see 2013 FCC Report ¶ 293, and "[s]ome reports indicate that OVD users are beginning to 'cut the cord' and drop their MVPD service in favor of OVD or a combination of OVD and over-the-air television," 2012 FCC Report ¶ 341. Nevertheless, because "[t]raditional television is the dominant device for video consumption," id. ¶ 338, OVDs are not currently "considered a fundamental threat to the MVPD business model," 2013 FCC Report ¶ 132.

While the entry of DBS providers, telephone companies, and OVDs into the MVPD market has significantly increased competition, see 2012 FCC Report ¶ 138 ("[C]ompetition continues to reduce cable's share of the U.S. video market and . . . cable MVPDs are expected to continue losing basic video subscribers to competing MVPDs."), cable operators continue to maintain significant MVPD market shares in many localities. For example, as

of mid-2010, Comcast maintained at least a 40% share in 13 of the 20 largest MVPD markets in the United States, ranging from as low as 43% in Houston to as high as 62% in Chicago and 67% in Philadelphia. See 2011 Comcast/NBCU Order ¶ 116 & n.275. Moreover, cable operators' market strength continues to be consolidated in particular geographic areas. Comcast's subscribers, for instance, are "clustered in the mid-Atlantic, Chicago, Denver, and Northern California," while Time Warner's subscribers are "clustered in New York State (including New York City), the Carolinas, Ohio, Southern California (including Los Angeles), and Texas." 2013 FCC Report ¶¶ 96–97.

Since 1992, there also has been a decline in vertical integration among cable operators and programming networks in the video programming industry. Compare H.R. Rep. No. 102-628, at 41 (stating that 57% of national networks were affiliated with cable operators in 1992), with 2012 FCC Report ¶¶ 43–44 & n.96 (indicating that, as of early 2012, 127 of estimated 800 national networks, or approximately 16%, were affiliated with top five cable operators), and 2013 FCC Report ¶ 39 (stating that number of national networks affiliated with top five cable operators fell to 99 in early 2013); see id. Table B-1 (listing national programming networks affiliated with top five cable operators). At the same time, however, Time Warner maintains an ownership interest in four national networks, including MLB Network; Cox Communications has an interest in six national networks, including MLB Network and the Travel Channel; Cablevision has an ownership in ten, including AMC and IFC; and Bright House Networks has an interest in 29, including Animal Planet and

26

Discovery Channel. See id. ¶ 39, Table B-1. And, as we have already discussed, Comcast's merger with NBC Universal, see supra at **[24]** n.5, resulted in Comcast's having ownership interests in 50 national networks, including Bravo, E! Entertainment TV, CNBC, MSNBC, USA Network, and The Weather Channel, see 2013 FCC Report ¶ 39, Table B-1. Aside from national networks, each of these cable operators also has an ownership interest in numerous regional news or sports networks. See id. Table C-1.

Like Congress in 1992, the FCC continues to view the effects of vertical integration on the video programming industry as mixed. While potential benefits include "efficiencies in the production, distribution, and marketing of video programming, as well as the incentive to expand channel capacity and create new programming by lowering the risks associated with program production ventures," id. ¶ 38 n.87, possible harms include "unfair methods of competition, discriminatory conduct, and exclusive contracts that are the result of coercive activity," id. ¶ 38 n.88.

E.    The Instant Appeal

Upon issuance of the 2011 FCC Order, the Cable Companies timely filed petitions for judicial review.[6] See 28 U.S.C. § 2344. They argue that the program carriage regime violates the First Amendment in light of the current state of the MVPD market. They also

---

[6] On November 7, 2011, the NCTA filed a petition for review of the 2011 FCC Order in the D.C. Circuit. On November 22, 2011, the D.C. Circuit transferred that petition to this court pursuant to 28 U.S.C. § 2112(a)(5), where it was consolidated with the petition for review of the 2011 FCC Order filed by Time Warner on October 11, 2011.

claim that the FCC failed to provide adequate notice of and opportunity to comment on the standstill rule under the APA. We address each of these arguments in turn.

## II.    Discussion

### A.    First Amendment Challenge

The First Amendment states that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. There is no question that cable operators and other MVPDs "engage in and transmit speech" protected by the First Amendment. Turner I, 512 U.S. at 636. "[B]y exercising editorial discretion over which stations or programs to include in [their] repertoire," MVPDs "communicate messages on a wide variety of topics and in a wide variety of formats." Id. (internal quotation marks omitted). Nor is there any dispute that the program carriage regime regulates MVPDs' protected speech by restraining their editorial discretion over which programming networks to carry and on what terms. See Turner Broad. Sys., Inc. v. FCC, 520 U.S. 180, 214 (1997) ("Turner II"); Turner I, 512 U.S. at 637; accord Cablevision Sys. Corp. v. FCC, 570 F.3d 83, 96–97 (2d Cir. 2009). The question here, then, is whether such regulation is justified by a countervailing government interest under the appropriate level of First Amendment scrutiny.

In their petitions for review, the Cable Companies contend that the FCC erred when, in issuing the 2011 FCC Order, it subjected the program carriage regime to intermediate scrutiny. The Cable Companies submit that the regime's restrictions are content and speaker

28

based, thus requiring strict scrutiny. In any event, the Cable Companies argue that the program carriage regime cannot survive either strict or intermediate scrutiny.

On de novo review of this constitutional challenge to the 2011 FCC Order, see Cablevision Sys. Corp. v. FCC, 570 F.3d at 91, we conclude that intermediate scrutiny is the appropriate level of review and that the FCC program carriage regime satisfies that standard. While rapidly increasing competition in the video programming industry may undermine that conclusion in the not-too-distant future, that time has not yet come. We thus deny the Cable Companies' petitions insofar as they challenge the program carriage regime under the First Amendment.

### 1. The Appropriate Level of Scrutiny

"At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence." Turner I, 512 U.S. at 641. The First Amendment thus stands against government "attempts to disfavor certain subjects or viewpoints." Citizens United v. FEC, 558 U.S. 310, 340 (2010); see Turner I, 512 U.S. at 641 ("Government action that stifles speech on account of its message, or that requires the utterance of a particular message favored by the Government, contravenes this essential right."). "Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others." Citizens United v. FEC, 558 U.S. at 340; see First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 784–85 (1978). A content- or speaker-based restriction on protected speech

29

is subject to strict scrutiny and will be tolerated only upon a showing that it is narrowly tailored to a compelling government interest.  See Turner I, 512 U.S. at 642, 653, 658.  On the other hand, a regulation of protected speech that is content neutral and that does not disfavor certain speakers is reviewed under the less-stringent intermediate level of scrutiny.  See id. at 642, 645, 661–62.  Courts have consistently reviewed challenges to the Cable Act and regulations promulgated pursuant thereto under intermediate scrutiny.  See, e.g., Turner II, 520 U.S. at 213; Turner I, 512 U.S. at 661–62; Cablevision Sys. Corp. v. FCC, 649 F.3d 695, 711 (D.C. Cir. 2011); Cablevision Sys. Corp v. FCC, 570 F.3d at 97; Time Warner Entm't Co. v. FCC, 240 F.3d 1126, 1130 (D.C. Cir. 2001); Time Warner Entm't Co. v. United States, 211 F.3d 1313, 1318 (D.C. Cir. 2000); Time Warner Entm't Co. v. FCC, 93 F.3d 957, 969 (D.C. Cir. 1996).  Because the program carriage regime is content and speaker neutral, it warrants no different treatment.

### a.    Content Neutrality

"Deciding whether a particular regulation is content based or content neutral is not always a simple task."  Turner I, 512 U.S. at 642.  "The principal inquiry . . . is whether the government has adopted a regulation of speech because of agreement or disagreement with the message it conveys."  Id. (alterations and internal quotation marks omitted).  In making this determination, "we look to the purpose behind the regulation."  Bartnicki v. Vopper, 532 U.S. 514, 526 (2001).  "[T]ypically, government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech."  Id.

30

(emphasis in original; alteration and internal quotation marks omitted). While "[t]he purpose, or justification, of a regulation will often be evident on its face," Turner I, 512 U.S. at 642, "even a regulation neutral on its face may be content based if its manifest purpose is to regulate speech because of the message it conveys," id. at 645; see Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (stating that government's purpose, not regulation's text, is "controlling consideration" in determining content neutrality).

Applying these principles here, we conclude that § 616(a)(3) and (5) of the Cable Act, by its terms, neither favors nor disfavors any particular message or view and, indeed, makes no reference to content. See 47 U.S.C. § 536(a)(3), (5). To invoke the protections of that statute, an unaffiliated network must establish that a cable operator or other MVPD (1) discriminated against it on the basis of affiliation, or more precisely its lack of affiliation with the MVPD, and (2) thereby unreasonably restrained its ability to compete fairly. See id. § 536(a)(3). The statute thus prohibits only discrimination on the basis of affiliation. It confers no protections based on the content of an unaffiliated network's programming. Indeed, as the FCC acknowledged during oral argument, an MVPD may decline to carry an unaffiliated network, whatever the content of its programming, because it opposes the views expressed by the network or for a legitimate business purpose. See Comcast Cable Commc'ns, LLC v. FCC, 717 F.3d 982, 985 (D.C. Cir. 2013) ("There is also no dispute that the statute prohibits only discrimination based on affiliation. Thus, if the MVPD treats vendors differently based on a reasonable business purpose . . . , there is no violation."

31

(emphasis in original)); TCR Sports Broad. Holding, LLP v. FCC, 679 F.3d 269, 272, 278 (4th Cir. 2012) (affirming FCC order concluding that Time Warner did not violate program carriage rules by denying unaffiliated network carriage on same tier as affiliated network based on legitimate business reasons); 2011 FCC Order ¶ 17 (stating that MVPD may make adverse carriage decision for "legitimate and non-discriminatory business reasons"). Of course, an adverse carriage decision based on the views expressed by an unaffiliated network or a legitimate business reason is permissible only insofar as it is not a pretext for affiliation-based discrimination. See Comcast Cable Commc'ns, LLC v. FCC, 717 F.3d at 985. But absent pretext, the statute affords no protection to any specific content and, thus, is content neutral on its face. See Time Warner Entm't Co. v. FCC, 93 F.3d at 969 (concluding that leased access provisions of Cable Act are content neutral because networks' ability to invoke those provisions "depends not on the content of their speech, but on their lack of affiliation with the operator, a distinguishing characteristic stemming from considerations relating to the structure of cable television").[7]

Moreover, the Cable Companies do not—and, in light of the statute's legislative history, cannot—claim that the purpose of § 616(a)(3) and (5) is to suppress any particular

---

[7] The Cable Companies' reliance on Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241 (1974), is misplaced. Unlike the right-of-reply rules struck down in that case, the program carriage regime is "not activated by any particular message spoken by [MVPDs] and thus exact[s] no content-based penalty," Turner I, 512 U.S. at 655, and it does not mandate that MVPDs support views that they oppose, see Miami Herald Publ'g Co. v. Tornillo, 418 U.S. at 256–57.

32

message or idea.  See supra at **[8–13]**.  Congress's concern in enacting the statute "was not with what a cable operator might say," but with the possibility that, as a result of its bottleneck power and vertical integration with affiliated networks, "it might not let others say anything at all in the principal medium for reaching much of the public."  Time Warner Entm't Co. v. United States, 211 F.3d at 1317–18.  Congress enacted § 616(a)(3) and (5) to minimize this threat, not to suppress any particular message or viewpoint.  Such a purpose is not content based.  See Comcast Cable Commc'ns, LLC v. FCC, 717 F.3d at 993 (Kavanaugh, J., concurring) ("[U]nder the Supreme Court's precedents, Section 616's impact on a cable operator's editorial control is content-neutral . . . .").

We reach the same conclusion with respect to the 2011 FCC Order's prima facie standard. Under that standard, an unaffiliated network may show affiliation-based discrimination through (1) direct evidence or (2) circumstantial evidence that an MVPD treated it differently than a "similarly situated" affiliated network.  47 C.F.R. § 76.1302(d)(3)(iii)(B). In determining whether two networks are similarly situated, the FCC acknowledges that it examines the content of the networks' programming.  See id. (stating that FCC considers, among other factors, "genre" and "target programming").  In light of this examination, the prima facie standard "'might in a formal sense be described as content-based,'" but not as that term has been employed by the Supreme Court.  Cablevision Sys. Corp. v. FCC, 649 F.3d at 717 (quoting BellSouth Corp. v. FCC, 144 F.3d 58, 69 (D.C. Cir. 1998)).  Not only is there "absolutely no evidence" that "the Commission issued its

[prima facie standard] to disfavor certain messages or ideas," but also the Cable Companies point to no specific content that the standard disfavors. Id.

That conspicuous omission from their argument is explained by a simple fact:  the prima facie standard, like § 616(a)(3) under which it was promulgated, treats all content equally.  Depending on the circumstances of a given case, any content may weigh in favor of or against a finding that an unaffiliated network is similarly situated to an affiliated network.  But the standard does not itself favor or disfavor particular content.  To illustrate, assume that an unaffiliated network devoted to sports files a § 616(a)(3) complaint against a cable operator.  If the cable operator is affiliated with a sports network, the unaffiliated network's sports content will weigh in favor of a finding that it is similarly situated. Meanwhile, if the cable operator is not affiliated with a sports network, the unaffiliated network is less likely to be found similarly situated.  In either instance, though, it is the cable operator's own content choice, not the government's, that determines whether the unaffiliated network's sports content is favored.

Thus, the prima facie standard may favor certain content in one case while disfavoring the same content in another case.  But neither in its adoption nor in its operation does the standard reflect government "agreement or disagreement" with any particular ideas or viewpoints.  Turner I, 512 U.S. at 642 (alteration and internal quotation marks omitted); cf. Burson v. Freeman, 504 U.S. 191, 197–98 (1992) (holding statute content based where it prohibited political speech near polling places); Boos v. Barry, 485 U.S. 312, 318–19 (1988)

34

(plurality opinion) (holding ordinance content based because it prohibited picketing critical of foreign government in front of country's embassy). Rather, the standard simply employs a hallmark of discrimination law, the comparison of similarly-situated parties, cf. Ruiz v. County of Rockland, 609 F.3d 486, 493–94 (2d Cir. 2010), as a vehicle for determining whether an MVPD is discriminating against unaffiliated networks in a way that impedes fair competition. Precisely because it is the MVPD's own affiliations that in each case provide the benchmark for the similarity comparison, we conclude that the prima facie standard, like the statutory provisions that inform it, is justified without reference to content. Its purpose is to prevent an MVPD who is affiliated with programming networks from discriminating against unaffiliated networks. In short, its purpose is competition based, not content based.

In urging otherwise, the Cable Companies submit that the FCC's mere examination of content renders the prima facie standard content based. Our case law is to the contrary. We have held that a regulation requiring governmental examination of content is content neutral as long as the regulation's purpose is not to disfavor any particular messages or ideas. See Cablevision Sys. Corp. v. FCC, 570 F.3d at 97 (holding FCC's market-modification order content neutral, despite its consideration of "amount of local programming," where Cablevision had "not alleged, much less proven" order "was based on some illicit content-based motive"); Hobbs v. County of Westchester, 397 F.3d 133, 152–53 (2d Cir. 2005) (concluding permit regulation content neutral, although "content of the applicant's proposed presentation [was] examined," because specific content was irrelevant to

35

governmental goal of protecting children); see also Cablevision Sys. Corp. v. FCC, 649 F.3d at 717–18 (holding regulations content neutral, even though "triggered by whether the programming at issue involve[d] sports," because no evidence FCC sought to disfavor any particular message); BellSouth Corp. v. FCC, 144 F.3d at 69 (holding statute "expressly formulated in terms of content" to be content neutral because "underlying purpose" was not to "favor or disfavor particular viewpoints").

The cases relied on by the Cable Companies do not demonstrate otherwise. They recognize laws or regulations as content based when content is examined as part of a governmental effort to suppress a certain message. See FCC v. League of Women Voters, 468 U.S. 364, 383 (1984) (holding statute requiring examination of content to be content based in that it disfavored editorial speech); Carey v. Brown, 447 U.S. 455,  462 (1980) (concluding that statute prohibiting non-labor picketing and requiring examination of content was content based); see also Fox Television Stations, Inc. v. FCC, 613 F.3d 317, 333 (2d Cir. 2010) (expressing concern that vague standard would permit FCC to engage in "subjective, content-based decision-making"), vacated and remanded on other grounds by 132 S. Ct. 2307 (2012).

Where, as here, the government examines content to determine whether a regulation applies, with no indication that the regulation favors or disfavors any particular content, the concerns that compel strict scrutiny of content-based laws are not present. Content-based regulations are highly suspect because the government can use such regulations to drive

disfavored ideas or views from the marketplace.  See Hobbs v. County of Westchester, 397

F.3d at148 (citing Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd., 502

U.S. 105, 116 (1991)).  "Laws of this sort pose the inherent risk that the Government seeks

not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information

or manipulate the public debate through coercion rather than persuasion."  Turner I, 512 U.S.

at 641.  By contrast, a regulation that assesses content without expressing a content

preference poses "a less substantial risk of excising certain ideas or viewpoints from the

public dialogue."  Id. at 642.  The program carriage regime expresses no government content

preference for particular ideas or viewpoints.  It simply prohibits MVPDs from

discriminating against unaffiliated networks similarly situated to the MVPDs' affiliated

networks.  As such, the regime is properly considered content neutral.

### b.    Speaker Neutrality

"[S]peaker-based laws demand strict scrutiny when they reflect the Government's

preference for the substance of what the favored speakers have to say (or aversion to what

the disfavored speakers have to say)."  Turner I, 512 U.S. at 658.  But "[s]o long as they are

not a subtle means of exercising a content preference, speaker distinctions . . . are not

presumed invalid under the First Amendment."  Id. at 645.

Here, the program carriage regime reflected in § 616(a)(3) and (5) of the Cable Act

and the FCC's prima facie standard does distinguish among speakers.  Unaffiliated networks

are favored because the regime affords protections to them that are not afforded to affiliated

37

networks, i.e., it prohibits affiliation-based discrimination that unreasonably restrains unaffiliated networks' ability to compete fairly. Meanwhile, cable operators and other MVPDs are burdened insofar as the regime requires them to carry unaffiliated networks that they might not otherwise carry or on terms that they might not otherwise offer. Their affiliates, too, are burdened by the resulting increased competition. To the extent the program carriage regime might thus be understood to favor certain speakers over others, the pertinent question for determining the appropriate level of scrutiny is whether that preference is "based on the content of programming each group offers." Id. at 658–59. The answer, as we have just explained, see supra at **[31–38]**, is no.

In asserting that strict scrutiny is warranted here, the Cable Companies contend that all speaker-based regulations, regardless of whether they are grounded in a content preference, are presumptively invalid. The Supreme Court rejected this argument in Turner I. See 512 U.S. at 657 ("To the extent appellants' argument rests on the view that all regulations distinguishing between speakers warrant strict scrutiny, it is mistaken." (citation omitted)). Indeed, in that case, the Court subjected a speaker-based regulation under the Cable Act to intermediate scrutiny precisely because it did not reflect a content preference. See id. at 658–59, 662.

The Cable Companies submit that, subsequent to Turner I, the Supreme Court reviewed a speaker-based law under strict scrutiny in Citizens United, after stating that, "[q]uite apart from the purpose or effect of regulating content," the government "may commit

38

a constitutional wrong when by law it identifies certain preferred speakers." Citizens United v. FEC, 558 U.S. at 340. Citizens United, however, reached that conclusion in the particular context of political speech. See id. at 341 ("We find no basis for the proposition that, in the context of political speech, the Government may impose restrictions on certain disfavored speakers." (emphasis added)). In that area, the Court observed that the "First Amendment has its fullest and most urgent application." Id. at 339 (internal quotation marks omitted); see also Arizona Free Enter. Club's Freedom Club PAC v. Bennett, 131 S. Ct. 2806, 2821, 2824 (2011) (subjecting speaker-based law that regulated political speech to strict scrutiny). In the absence of clearer direction from the Supreme Court, we will not ourselves assume that Citizens United implicitly reversed Turner I to compel strict scrutiny of all speaker-based preferences, even outside the political-speech context. See United States v. Gomez, 580 F.3d 94, 104 (2d Cir. 2009) ("'If a precedent of th[e] [Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to th[e] Court the prerogative of overruling its own decisions.'" (quoting Agostini v. Felton, 521 U.S. 203, 237 (1997))).

Accordingly, because the program carriage regime is neither content based nor impermissibly speaker based, we subject it to intermediate scrutiny.

### 2. Intermediate Scrutiny

"[T]he intermediate level of scrutiny [is] applicable to content-neutral restrictions that impose an incidental burden on speech." Turner I, 512 U.S. at 662. Such a restriction will be sustained under this standard if it (1) "advances important governmental interests unrelated to the suppression of free speech" and (2) "does not burden substantially more speech than necessary to further those interests." Turner II, 520 U.S. at 189 (citing United States v. O'Brien, 391 U.S. 367, 377 (1968)); accord Cablevision Sys. Corp. v. FCC, 570 F.3d at 97. The program carriage regime satisfies these two requirements.

### a. Important Government Interests

The FCC submits that the program carriage regime serves two important government interests by promoting (1) fair competition and (2) a diversity of information sources in the video programming market. The Supreme Court has already recognized that such interests, "viewed in the abstract," are important and distinct from the suppression of free expression or the content of any speaker's message. Turner I, 520 U.S. at 662–63. The government's "interest in eliminating restraints on fair competition is always substantial, even when the individuals or entities subject to particular regulations are engaged in expressive activity protected by the First Amendment." Id. at 664. "Likewise, assuring that the public has access to a multiplicity of information sources is a governmental purpose of the highest order, for it promotes values central to the First Amendment." Id. at 663 (observing that "it has long been a basic tenet of national communications policy that the widest possible

40

dissemination of information from diverse and antagonistic sources is essential to the welfare of the public" (internal quotation marks omitted)).

"Of course, just because the government's 'asserted interests are important in the abstract does not mean'" that a challenged program "'will in fact advance those interests.'" Cablevision Sys. Corp. v. FCC, 649 F.3d at 711 (quoting Turner I, 512 U.S. at 664 (plurality)). When, as here, "'the government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.'" Id. (alterations omitted) (quoting Turner I, 512 U.S. at 664 (plurality)). Thus, the FCC's determination that the program carriage regime protects against unfair competition and promotes diverse video programming sources must be based on "'reasonable inferences'" drawn from "'substantial evidence.'" Cablevision Sys. Corp. v. FCC, 597 F.3d at 1311 (quoting Turner I, 512 U.S. at 666 (plurality)); see Time Warner Entm't Co. v. FCC, 240 F.3d at 1133. This does not demand "'[c]omplete factual support in the record for the FCC's judgment or prediction.'" Turner II, 520 U.S. at 196 (alteration omitted) (quoting FCC v. Nat'l Citizens Comm. for Broad., 436 U.S. 775, 814 (1978)). "'[A] forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency.'" Id. (quoting FCC v. Nat'l Citizens Comm. for Broad., 436 U.S. at 814) (internal quotation marks omitted); see Time Warner Entm't Co. v. FCC, 240 F.3d at 1133 ("Substantial evidence does not require a complete factual

41

record—we must give appropriate deference to predictive judgments that necessarily involve the expertise and experience of the agency.").

Applying these principles here, we begin by noting that the program carriage regime calls for a "case-by-case" assessment of the anticompetitive effect of an MVPD's purported discrimination against an unaffiliated network. 2011 FCC Order ¶ 33. To justify such a regime, the FCC "has no obligation to establish that vertically integrated cable companies retain a stranglehold on competition nationally." Cablevision Sys. Corp. v. FCC, 649 F.3d at 712. Rather, it must show a reasonable basis for concluding that some markets exist in which MVPDs have the incentive and ability to harm unaffiliated networks and that application of the program carriage regime will alleviate that harm. See Turner II, 520 U.S. at 195; Turner I, 512 U.S. at 664–65 (plurality); Cablevision Sys. Corp. v. FCC, 649 F.3d at 712. The FCC has met this burden.

In reaching this conclusion, we are mindful that a law "impos[ing] current burdens . . . must be justified by current needs." Shelby County v. Holder, 133 S. Ct. 2612, 2622 (2013) (internal quotation marks omitted). We also recognize that the video programming industry has changed significantly over the last two decades: cable operators' share of the MVPD market has declined due to increased competition from DBS providers and telephone companies, OVDs are an increasingly available alternative to MVPDs, and vertical integration between cable operators and programming networks has decreased. See supra at [25–28]. These circumstances strongly suggest an industry trending toward more

42

rather than less competition. If the trend continues, a day may well come when the anticompetitive concerns animating Congress's enactment of § 616(a)(3) and (5) will so effectively be eliminated or reduced as to preclude government intrusion on MVPDs' carriage decisions. See generally Time Warner Entm't Co. v. FCC, 240 F.3d at 1135 (noting that, "at some point," marginal value of increment in diversity "would not qualify as an 'important' governmental interest"). We here conclude only that such a day has not yet arrived.

The industry's current competitive posture presents "a 'mixed picture' when considered as a whole." Cablevision Sys. Corp. v. FCC, 649 F.3d at 712 (quoting Cablevision Sys. Corp. v. FCC, 597 F.3d at 1314). Cable operators may not be as dominant as they were in 1992 when Congress enacted the Cable Act. Nevertheless, cable operators continue to hold more than 55% of the national MVPD market and to enjoy still higher shares in a number of local MVPD markets. See 2013 FCC Report ¶¶ 3, 96–97; 2011 Comcast/NBCU Order ¶ 116 & n.275; see also Comcast Cable Commc'ns, LLC v. FCC, 717 F.3d at 992 n.3 (Kavanaugh, J., concurring) ("In some local geographic markets around the country, [an MVPD] may have market power."); Cablevision Sys. Corp. v. FCC, 649 F.3d at 712 ("[C]lustering and consolidation in the industry bolsters the market power of cable operators because a single geographic area can be highly susceptible to near-monopoly control by a cable company." (internal quotation marks omitted)); Cablevision Sys. Corp. v. FCC, 597 F.3d at 1314 ("In designated market areas in which a single cable company

43

controls a clustered region, market penetration of competitive MVPDs is even lower than nationwide rates.").[8]  Similarly, although vertical integration has generally declined, a significant number of national and regional programming networks remain affiliated with cable operators.  See 2013 FCC Report ¶ 39, Table B-1, Table C-1; 2012 FCC Report ¶¶ 43–44; 2011 Comcast/NBCU Order ¶ 116; see also Cablevision Sys. Corp. v. FCC, 649 F.3d at 712 ("[D]espite major gains in the amount and diversity of programming, as of 2007[,] the four largest cable operators were still vertically integrated with six of the top 20 national networks, some of the most popular premium networks, and almost half of all regional sports networks." (alterations and internal quotation marks omitted)).

Indeed, despite the Cable Companies' assertions to the contrary, the 2011 FCC Order cited substantial record evidence that cable operators maintain significant shares in various local markets and that vertical integration remains pervasive in the video programming industry.  In particular, the 2011 FCC Order relied on the 2011 Comcast/NBCU Order, which points out that, as of mid-2010, Comcast held a more-than-60% share in certain major MVPD markets.  See 2011 Comcast/NBCU Order ¶ 116 (cited by 2011 FCC Order ¶ 33 nn.135–36).  Additionally, the 2011 Comcast/NBCU Order explained that the vertical integration of

---

[8] The Cable Companies rely on Comcast Corp. v. FCC, 579 F.3d 1 (D.C. Cir. 2009), to argue that cable operators "no longer have the bottleneck power over programming that concerned the Congress in 1992," id. at 8.  The relevant market in that case, however, was the national MVPD market, not local MVPD markets.  See id.  As the D.C. Circuit has pointed out in the subsequent cases cited in text, cable operators retain market power in certain local MVPD markets.

Comcast, the nation's largest cable operator and MVPD, with NBCU, the nation's fourth largest owner of programming networks, provides Comcast with an increased incentive and ability to harm unaffiliated networks. See id. ¶¶ 110, 116 (cited by 2011 FCC Order ¶ 33 n.136).[9]

From this record evidence, the FCC could reasonably conclude that cable operators continue to "have the incentive and ability to favor their affiliated programming vendors in individual cases, with the potential to unreasonably restrain the ability of an unaffiliated programming vendor to compete fairly." 2011 FCC Order ¶ 33. As the 2011 FCC Order explained, see id. ¶ 4, in enacting the Cable Act, Congress sought to combat the threat that vertically integrated cable operators with market power pose to unaffiliated networks. A vertically integrated cable operator has an interest in the success of its affiliated networks and a corollary interest in harming, through adverse carriage decisions, unaffiliated networks that compete with its affiliates. If a vertically integrated cable operator possesses market power in a local MVPD market, by virtue of its bottleneck control, it has the ability to prevent an unaffiliated network from reaching a substantial portion of consumers in that market. It thereby may significantly inhibit the unaffiliated network's ability to compete fairly in that area's video programming market, potentially driving it from that market altogether. Based

---

[9] We reject the Cable Companies' argument that data regarding Comcast cannot be used to justify the program carriage regime's regulation of other MVPDs' speech. The Cable Companies have brought a facial, not an as-applied, challenge to the program carriage regime and, thus, we properly consider whether the video programming industry, in whole or in part, justifies the challenged regime. See Cablevision Sys. Corp. v. FCC, 649 F.3d at 712.

45

on this competitive threat documented in the legislative history of the Cable Act, it was reasonable for the FCC to infer that, in some cases, a vertically integrated cable operator with a significant share of an MVPD market will have the incentive and ability to prevent unaffiliated networks from competing fairly in a video programming market.

We recognize that a significant market share does not always translate into market power. "[N]ormally a company's ability to exercise market power depends not only on its share of the market, but also on elasticities of supply and demand, which in turn are determined by the availability of competition." Time Warner Entm't Co. v. FCC, 240 F.3d at 1134 (emphasis omitted); accord Comcast Corp. v. FCC, 579 F.3d 1, 6 (D.C. Cir. 2009); see Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d 90, 98 (2d Cir. 1998) ("A court will draw an inference of monopoly power only after full consideration of the relationship between market share and other relevant market characteristics."). Thus, as the Cable Companies suggest, in certain markets, despite an adverse carriage decision by a cable operator with a dominant market share, an unaffiliated network may still be able to reach many consumers through competing MVPDs, like DBS and telephone companies, and OVDs. Under such circumstances, a cable operator's refusal to carry an unaffiliated network may lead consumers to switch to an alternative MVPD or to drop MVDP service in favor of OVDs in order to obtain access to that network. See Comcast Corp. v. FCC, 579 F.3d at 7; Time Warner Entm't Co. v. FCC, 240 F.3d at 1134. This possibility of losing subscribers

due to an adverse carriage decision would undercut a cable operator's ability to wield market power to discriminate against unaffiliated networks.

At the same time, however, we cannot overlook record evidence that cable operators maintain a more than 60% market share in certain MVPD markets, see 2011 Comcast/NBCU Order ¶ 116; that OVDs, which are still in their infancy as a medium, do not currently pose a significant competitive threat to MVPDs, see id. ¶¶ 63–66, 79; and that the video programming industry has a long history of economic dysfunction, see supra at **[8–13]**. Given these facts, even if cable operators with dominant MVPD market shares may not exercise market power in all cases, the FCC had a substantial evidentiary basis to conclude that some cable operators maintain the capacity to inhibit unaffiliated networks from competing fairly, supporting a program carriage regime for identifying anticompetitive conduct on a case-by-case basis. See Tops Mkts., Inc. v. Quality Mkts., Inc., 142 F.3d at 99 ("'Sometimes, but not inevitably, it will be useful to suggest that a market share below 50% is rarely evidence of monopoly power, a share between 50% and 70% can occasionally show monopoly power, and a share above 70% is usually strong evidence of monopoly power.'" (quoting Broadway Delivery Corp. v. United Parcel Serv. of America, Inc., 651 F.2d 122, 129 (2d Cir. 1981))). We defer to that reasonable judgment. See Cablevision Sys. Corp v. FCC, 597 F.3d at 1314 ("We do not sit as a panel of referees on a professional economic journal, but as a panel of generalist judges obliged to defer to a reasonable judgment by an

47

agency acting pursuant to congressionally delegated authority." (alteration and internal quotation marks omitted)).

The record also permitted the FCC reasonably to conclude that the program carriage regime would ameliorate the anticompetitive harm that vertically integrated cable operators pose to unaffiliated networks. Under that regime, when anticompetitive conduct is proved in a particular case, the FCC has the authority to order remedies appropriate to that case. The regime thus directly targets the threatened harm and provides the FCC with the means to redress it. In so doing, it promotes important government interests in fair competition and diversity of information sources in the video programming market.

### b. Narrow Tailoring

To show that a regulation is narrowly tailored under intermediate scrutiny, the government need not demonstrate that the regulation is "the least speech-restrictive means of advancing the Government's interests." Turner I, 512 U.S. at 662. It must, however, show that the "regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." Id. (internal quotation marks omitted). "Narrow tailoring in this context requires, in other words, that the means chosen do not burden substantially more speech than is necessary to further the government's legitimate interests." Id. (internal quotation marks omitted).

The program carriage regime is carefully tailored to avoid placing any greater burden on MVPDs' editorial discretion than is warranted to promote competition and diverse

48

programming sources. The regime prohibits only affiliation-based discrimination by MVPDs and only when such discrimination is shown to have an anticompetitive effect. It does not prohibit an MVPD from declining to carry an unaffiliated network because it opposes the views expressed by that network. See supra at **[32–33]**. It does not prohibit MVPDs from declining to carry an unaffiliated network for legitimate business reasons. See Comcast Cable Commc'ns, LLC v. FCC, 717 F.3d at 985; TCR Sports Broad. Holding, LLP v. FCC, 679 F.3d at 272, 278; 2011 FCC Order ¶ 17.[10] Nor does it necessarily prohibit affiliation-based discrimination in competitive markets, where there is a showing that such discrimination has beneficial effects that are not anticompetitive. See Comcast Cable Commc'ns, LLC v. FCC, 717 F.3d at 990 (Kavanaugh, J., concurring) ("Vertical integration and vertical contracts in a competitive market encourage product innovation, lower costs for businesses, and create efficiencies—and thus reduce prices and lead to better goods and services for consumers."). Moreover, the regime requires the FCC to evaluate individual unaffiliated networks' complaints on a case-by-case basis, and it demands proof of impermissible affiliation-based discrimination and anticompetitive effect before any restrictions are placed on the MVPD's carriage decision.[11]

---

[10] As stated supra at **[32]**, an adverse carriage decision based on the views expressed by an unaffiliated network or a legitimate business reason is permissible only insofar as it is not a pretext for affiliation-based discrimination.

[11] As discussed in section II.B. infra, we are today vacating the standstill rule because the FCC promulgated it in violation of the APA's notice-and-comment requirements, and thus we consider the program carriage regime's constitutionality without regard thereto.

The Cable Companies nevertheless argue that the program carriage regime is not sufficiently tailored because neither § 616(a)(3) nor the prima facie standard established by the 2011 FCC Order explicitly requires an unaffiliated network to demonstrate that a purportedly discriminating MVPD possesses market power. The FCC responds that proof of market power is not necessarily a prerequisite to relief under the regime. We need not here decide whether a § 616(a)(3) violation can ever be shown in the absence of market power. The program carriage regime requires an unaffiliated-network complainant to make a case-specific showing that an MVPD "unreasonably restrain[ed]" its ability to "compete fairly," 47 U.S.C. § 536(a)(3), and market power is generally a "significant consideration" under such a requirement, Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 885–86 (2007) (identifying market power as "significant consideration" in determining whether conduct is unreasonable restraint under § 1 of Sherman Act); see Comcast Cable Commc'ns, LLC v. FCC, 717 F.3d at 990 (Kavanaugh, J., concurring) (stating that, in antitrust law, "conduct generally can be considered unreasonable only if a firm, or multiple firms acting in concert, have market power"). In light of this fact, even if the regime does not explicitly require proof of market power, we expect that the FCC will consider market power in evaluating the vast majority of future § 616(a)(3) complaints. Thus, on this facial challenge to the overall program carriage regime, we conclude that the regime's "unreasonable restraint" requirement renders it narrowly tailored so as not to burden more speech than necessary to advance the government's interests. See generally Velazquez v.

50

Legal Servs. Corp., 164 F.3d 757, 767 (2d Cir. 1999) (rejecting facial First Amendment challenge, but stating that "[a]ny grantee capable of demonstrating that . . . restrictions in fact unduly burden its capacity to engage in protected First Amendment activity remains free to bring an as-applied challenge").

In urging otherwise, the Cable Companies contend that the prima facie standard in fact precludes the FCC from considering market power and deems any adverse carriage decision by an MVPD with respect to an unaffiliated network an unreasonable restraint. In support, they point out that the 2011 FCC Order references several factors—not including market power—that the FCC has considered in past identifications of anticompetitive discrimination, such as, the impact of an MVPD's adverse carriage decision on an unaffiliated network's "subscribership, licensee fee revenues, advertising revenues, ability to compete for advertisers and programming, and ability to realize economies of scale." 2011 FCC Order ¶ 15 n.60. The Cable Companies argue that analysis of such factors "is a truism, not a test, as a [programming network] can always show that its revenues would be greater if an MVPD had agreed to carriage (or carriage on a more widely distributed tier)." Time Warner Br. 49.

We are not persuaded by these circumstances that the FCC is precluded from considering market power in making either a prima facie or final determination on a § 616(a)(3) complaint. As an initial matter, we decline to speculate that, in future cases applying the newly established prima facie standard, the FCC will rely exclusively on the

factors it has previously used to identify a prima facie violation.[12]  Indeed, as we have already

explained, we expect that the FCC will consider market power when evaluating the vast

majority of future § 616(a)(3) complaints.  Regardless, even if the FCC relied exclusively on

those factors, it would not necessarily be precluded from considering market power because,

at least in some circumstances, proof that an adverse carriage decision had the cited

detrimental effects on an unaffiliated network may serve as a proxy for an inquiry into an

MVPD's market power.  See generally FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 460–61

(1986) ("[P]roof of actual detrimental effects, such as a reduction of output, can obviate the

need for an inquiry into market power, which is but a surrogate for detrimental effects."

(internal quotation marks omitted)); accord Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.,

386 F.3d 485, 509 (2d Cir. 2004).  Moreover, we do not assume that the FCC will effectively

nullify the unreasonable restraint requirement of § 616(a)(3) by recognizing any detrimental

effect on an unaffiliated network as sufficient to prove a prima facie violation, rather than

demanding proof of the significant or material detrimental effect implicit in the term

---

[12] For this reason, the pre-2011 cases cited by the Cable Companies, in which the FCC allegedly failed to require a showing of market power, are inapposite.  In any event, it is not clear that the FCC failed to consider cable operators' dominant market position in those cases.  See Tennis Channel, Inc. v. Comcast Cable Commc'ns, LLC, 25 FCC Rcd. 14149, ¶ 20 (Med. Bur. 2010) (stating that Comcast's "refusal to expand The Tennis Channel's distribution" was "particularly detrimental to the network" because "Comcast is the dominant cable operator in seven of the ten largest television markets"); Herring Broad., Inc. v. Time Warner Cable, Inc., 23 FCC Rcd. 14787, ¶ 19 (Med. Bur. 2008) (stating that Time Warner has "quasi monopolies in key markets, such as New York and Los Angeles, that are essential to WealthTV's long-term viability" (internal quotation marks omitted)).

"unreasonable restraint." See Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 546 (2d Cir. 1993) (stating that, under § 1 of Sherman Act, to prove unreasonable restraint, plaintiff must show that defendant's conduct "had a substantially harmful effect on competition").

Nor are we persuaded by the Cable Companies' arguments that narrow tailoring requires the FCC (1) to limit the program carriage regime to "particular geographic markets where the FCC could find, based on substantial evidence, that a particular MVPD exercised . . . bottleneck monopoly power," Time Warner Br. 44; (2) to promote its "diversity interest without resorting to compelled speech," by, for example, subsidizing or directly funding unaffiliated networks, id.; or (3) to create a regime that triggers less litigation and chills less speech. Challenged government conduct will not necessarily fail the narrow-tailoring requirement whenever "there is some imaginable alternative that might be less burdensome on speech." Turner II, 520 U.S. at 217. In any event, the Cable Companies have not demonstrated that their proposed alternatives are superior to the program carriage regime.

First, it hardly makes sense to require the FCC to conduct an ex ante analysis of every MVPD market in the United States given the rapid changes occurring in the video programming industry. In such dynamic circumstances, it is a more efficient use of limited FCC resources, and a fairer treatment of the parties, for the agency to analyze an MVPD market when an unaffiliated network lodges an actual complaint of anticompetitive

discrimination. Second, while subsidization or direct funding might enable unaffiliated networks to maintain financial viability despite affiliation-based discrimination, it would not necessarily provide such networks with access to consumers in markets where dominant MVPDs favored their affiliated networks. It is such access to consumers that enhances competition and diversity in the video programming market, and that is the relief the program carriage regime affords upon proof of affiliation-based discrimination. Finally, the prima facie standard established by the 2011 FCC Order, which requires evidence of affiliation-based discrimination and anticompetitive effect, allows the FCC to screen out frivolous complaints against MVPDs and thereby minimize the litigation burden and any possible chilling effect.[13] Thus, because the "burden imposed" by the regime is "congruent to the benefits it affords," we conclude that it is narrowly tailored. Turner II, 520 U.S. at 215.

In light of the real and significant competitive concerns that animated Congress's 1992 enactment of the Cable Act, the FCC reasonably proceeds with caution when confronting claims that changed market conditions no longer permit the law to intrude on MVPDs' carriage decisions consistent with the First Amendment. At the same time, there is no denying that the video programming industry is dynamic and that the level of competition has rapidly increased in the last two decades. In light of these changes, some

---

[13] The Cable Companies have pointed to no evidence that the program carriage regime has, in fact, chilled speech by deterring MVPDs from developing or investing in affiliated networks.

54

of the Cable Act's broad prophylactic rules may no longer be justified.  See Comcast Corp.

v. FCC, 579 F.3d at 8 (striking down under APA FCC rule that capped number of subscribers

that cable operator could serve at 30% of all subscribers in national market).  Nonetheless,

"nothing prevents the Commission from addressing any remaining barriers to effective

competition with appropriately tailored remedies."  Cablevision Sys. Corp. v. FCC, 649 F.3d

at 712.  We are satisfied that the program carriage regime currently serves this task.

At oral argument, however, the FCC acknowledged the possibility that, at some future

time, this conclusion will no longer obtain in light of increased competition in the video

programming industry.  From the record adduced by the parties, as well as the 2012 and 2013

FCC Reports, we consider this possibility more real than speculative.  Thus, at the same time

that we uphold the program carriage regime today, we encourage the FCC to reevaluate the

program carriage regime as warranted by increased competition in the video programming

industry.[14]

---

[14] For the same reasons that the program carriage regime survives intermediate scrutiny, we conclude that the prima facie standard is not arbitrary and capricious under the APA.  See Cablevision Sys. Corp. v. FCC, 649 F.3d at 713 ("First Amendment intermediate scrutiny is, of course, substantially more demanding than arbitrary and capricious review of agency action.")

Further, because we conclude that the program carriage regime is constitutional, we need not address the FCC's assertion that the Cable Companies waived their First Amendment and APA challenges to the prima facie standard.

B.      APA Challenge

Section 553 of the APA requires agencies to provide notice and an opportunity for public comment before a rule is promulgated. <u>See</u> 5 U.S.C. § 553(b), (c). The Cable Companies contend that the FCC did not adhere to the APA's notice-and-comment requirements in establishing the standstill rule in the 2011 FCC Order. In response, the FCC claims that no notice or comment opportunity was required for the standstill rule because it addresses procedure rather than substance. In any event, the FCC submits that the 2007 NPRM provided adequate notice of and opportunity to comment on the standstill rule.

"In general, we will overturn an agency decision only if it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." <u>Cablevision Sys. Corp. v. FCC</u>, 570 F.3d at 91 (internal quotation marks omitted). We agree with the Cable Companies that the FCC did not promulgate the standstill rule in accordance with the law because the agency failed to adhere to APA notice-and-comment requirements. We thus grant the Cable Companies' petitions insofar as they challenge the standstill rule, and we vacate that rule without prejudice to the FCC's re-promulgating in compliance with the APA.

1.      Procedural Rule Exception

The APA's notice-and-comment requirements apply only to "'substantive,'" or what are sometimes termed "'legislative,'" rules, not to, <u>inter alia</u>, "'rules of agency organization, procedure, or practice.'" <u>Lincoln v. Vigil</u>, 508 U.S. 182, 196 (1993) (quoting 5 U.S.C. § 553(b)); <u>see</u> <u>Electronic Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.</u>, 653 F.3d 1, 5

56

(D.C. Cir. 2011). In determining whether an agency has promulgated a substantive or a procedural rule, "the label that the particular agency puts upon its given exercise of administrative power is not, for our purposes, conclusive; rather it is what the agency does in fact." Lewis-Mota v. Sec'y of Labor, 469 F.2d 478, 481–82 (2d Cir. 1972). Substantive rules "create new law, rights, or duties, in what amounts to a legislative act." Sweet v. Sheahan, 235 F.3d 80, 91 (2d Cir. 2000) (internal quotation marks omitted); see Donovan v. Red Star Marine Servs., Inc., 739 F.2d 774, 783 (2d Cir. 1984) (stating that substantive rules "change existing rights and obligations" (internal quotation marks omitted)). A procedural rule, by contrast, "does not itself alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency." Electronic Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec., 653 F.3d at 5 (internal quotation marks omitted). Put another way, a procedural rule "does not impose new substantive burdens." Id. (internal quotation marks omitted).

Because all procedural rules affect substantive rights to some extent, see Lamoille Valley R.R. Co. v. ICC, 711 F.2d 295, 328 (D.C. Cir. 1983), the distinction between substantive and procedural rules might well be characterized as "one of degree depending upon whether the substantive effect is sufficiently grave so that notice and comment are needed to safeguard the policies underlying the APA," Electronic Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec., 653 F.3d at 5–6 (internal quotation marks omitted). Those policies are "to serve the need for public participation in agency decisionmaking and to ensure the

agency has all pertinent information before it when making a decision." Id. at 6 (citations and internal quotation marks omitted). "In order to further these policies, the exception for procedural rules must be narrowly construed." Id. (internal quotation marks omitted).

We conclude that the standstill rule does not fall within the procedural rule exception to the APA's notice-and-comment requirements. The standstill rule confers authority on the FCC temporarily to extend the term of a contractual agreement between an MVPD and an unaffiliated network while the network's program carriage complaint is pending. It thus significantly affects substantive rights. Indeed, the FCC does not dispute this fact. Instead, it contends that the standstill rule does not impose a new substantive burden. According to the FCC, because it "has granted interim injunctive relief in a variety of contexts," Respondents Br. 61, the standstill rule "merely codifies an existing procedure," and thus "it does not affect substantive rights any more than the pre-existing standstill procedure did," id. at 63. We are not persuaded.

Even if the FCC has issued standstill orders in other contexts, it is not clear that it has the authority to issue such an order under the program carriage regime. Before the standstill rule's establishment, no statute or regulation specifically conferred that authority on the FCC, and the FCC concedes that it has never imposed a standstill order in the program carriage context.[15] Moreover, as the 2011 FCC Order itself acknowledges, there are serious questions

_____

[15] Because the FCC has never issued a standstill order in the program carriage context, it cannot rely on cases in which courts have held an agency rule procedural because it modified procedures, but not substantive standards, for an established agency practice. See

58

as to whether §§ 616 and 624 of the Communications Act prohibit the FCC, at least in certain circumstances, from issuing a standstill order in the program carriage context. See 2011 FCC Order ¶ 26 n.107 (seeking comment on whether the standstill rule violates § 624 "in some circumstances" (emphasis in original)); id. ¶ 60 ("We seek comment on whether there are any circumstances in the program carriage context in which the Commission's authority to issue temporary standstill orders is statutorily or otherwise limited."); see also id. at 11610 & n.15 (Commissioner McDowell, approving in part and dissenting in part) (stating that standstill rule has not been "reviewed by the Commission or a court for consistency with" §§ 616 and 624 of Communications Act).[16]

Given the substantive burden imposed by the standstill rule, the absence of an established FCC practice of issuing standstill orders in the program carriage context, and the uncertainty about the FCC's authority to do so, "regardless whether this is a new substantive burden," the standstill rule "substantively affects the public to a degree sufficient to implicate the policy interests animating notice-and-comment rulemaking." Electronic Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec., 653 F.3d at 5 (emphasis added; internal quotation

JEM Broad. Co. v. FCC, 22 F.3d 320, 327 (D.C. Cir. 1994) (holding agency rule procedural because it employed same substantive standards as its predecessors); Notaro v. Luther, 800 F.2d 290, 291 (2d Cir. 1986) (holding agency rule procedural because "approach set out in the training aid accords with the Commission's regulations and past practices").

[16] We express no opinion as to whether the standstill rule is consistent with §§ 616 and 624 of the Communications Act.

marks omitted).  The rule thus is substantive and subject to the APA's notice-and-comment requirements.

## 2. Adequacy of Notice

The APA "requires an agency conducting notice-and-comment rulemaking to publish in its notice of proposed rulemaking 'either the terms or substance of the proposed rule or a description of the subjects and issues involved.'" Long Island Care at Home, Ltd. v. Coke, 551 U.S. 158, 174 (2007) (quoting 5 U.S.C. § 553(b)(3)).  We "have generally interpreted this to mean that the final rule the agency adopts must be 'a logical outgrowth of the rule proposed.'" Id. (quoting National Black Media Coal. v. FCC, 791 F.2d 1016, 1022 (2d Cir. 1986) (internal quotation marks omitted)).  "Clearly, if the final rule deviates too sharply from the proposal, affected parties will be deprived of notice and an opportunity to respond to the proposal." National Black Media Coal. v. FCC, 791 F.2d at 1022 (internal quotation marks omitted); accord Council Tree Commc'ns, Inc. v. FCC, 619 F.3d 235, 249 (3d Cir. 2010).  "The object, in short, is one of fair notice." Long Island Care at Home, Ltd. v. Coke, 551 U.S. at 174.

"[G]eneral notice that a new standard will be adopted affords the parties scant opportunity for comment." Horsehead Res. Dev. Co. v. Browner, 16 F.3d 1246, 1268 (D.C. Cir. 1994).  Thus, an agency's APA "obligation is more demanding." Id.  It must "describe the range of alternatives being considered with reasonable specificity." Prometheus Radio Project v. FCC, 652 F.3d 431, 450 (3d Cir. 2011) (internal quotation marks omitted).

60

"Otherwise, interested parties will not know what to comment on, and notice will not lead to better-informed agency decision-making." Id. (internal quotation marks omitted). Indeed, "unfairness results unless persons are sufficiently alerted to likely alternatives so that they know whether their interests are at stake." National Black Media Coal. v. FCC, 791 F.2d at 1023 (alteration and internal quotation marks omitted).

Here, the 2007 NPRM did not specifically indicate that the FCC was considering adopting a standstill rule. Nor can that rule be considered the logical outgrowth of the issues described in the 2007 NPRM. While the 2007 NPRM did seek comment on whether the FCC should "adopt rules to address the complaint process itself" and, specifically, whether it "should adopt additional rules to protect [programming networks] from potential retaliation if they file a complaint," 2007 NPRM ¶ 16, those solicitations are too general to provide adequate notice that a standstill rule was under consideration as a means to provide such protection. Thus, interested parties had no reason to comment on such a measure. See Prometheus Radio Project v. FCC, 652 F.3d at 450 (holding notice inadequate where it asked "two general questions" that failed to solicit comment on "overall framework under consideration"); Horsehead Res. Dev. Co. v. Browner, 16 F.3d at 1268 (concluding notice inadequate where it failed to indicate form that "ultimate standard" might take). Even if it was the FCC's intent to solicit comment on a standstill rule, "an unexpressed intention cannot convert a final rule into a logical outgrowth that the public should have anticipated." Council Tree Commc'ns, Inc. v. FCC, 619 F.3d at 254 (internal quotation marks omitted).

61

Indeed, the record shows that the public did not, in fact, anticipate that the FCC would adopt a standstill rule based on the 2007 NPRM. None of the commenters addressed such a rule during the official comment period—a fact that strongly suggests that the 2007 NPRM provided insufficient notice. See Prometheus Radio Project v. FCC, 652 F.3d at 452 (stating that lack of comments during official comment period showed that "interested parties were prejudiced" by inadequacy of notice); see also National Exch. Carrier Ass'n, Inc. v. FCC, 253 F.3d 1, 4 (D.C. Cir. 2001) ("[T]he logical outgrowth test normally is applied to consider whether a new round of notice and comment would provide the first opportunity for interested parties to offer comments that could persuade the agency to modify its rule." (internal quotation marks omitted); cf. Horsehead Res. Dev. Co. v. Browner, 16 F.3d at 1268 ("[I]nsightful comments may be reflective of notice and may be adduced as evidence of its adequacy.").

That conclusion is reinforced by the fact that, in a similar context, under the program access provision of the Cable Act, see 47 U.S.C. § 548, the FCC expressly sought comment on whether it should adopt a standstill rule.[17] See Council Tree Commc'ns, Inc. v. FCC, 619 F.3d at 254 (deeming it "instructive that the FCC had previously solicited broader comment . . . , and in much more specific terms than it did here"). That the FCC, with

_____

[17] See Implementation of the Cable Television Consumer Protection & Competition Act of 1992, 22 FCC Rcd. 17791, ¶¶ 135–37 (2007) (discussing proposal to adopt standstill requirement and seeking comment on issuance of temporary stay orders); see also 47 C.F.R. § 76.1003(l) (setting forth standstill requirements for program access complaints).

release of the 2011 FCC Order, solicited comment on several key aspects of the standstill rule's implementation, including whether its authority to issue standstill orders in the program carriage context is statutorily or otherwise limited, further indicates that the agency did not adequately solicit comments on the standstill rule in the first instance. See Prometheus Radio Project v. FCC, 652 F.3d at 451–52 (stating that later specific notice requesting comment indicated that earlier less-specific notice was insufficient).

Accordingly, we hold that the standstill rule was promulgated in violation of the APA's notice-and-comment requirements and, therefore, we order that it be vacated without prejudice to the FCC attempting to re-promulgate it consistent with the APA.[18]

## III. Conclusion

To summarize, we conclude as follows:

1. Section 616(a)(3) and (5) of the Communications Act of 1934, as amended by the Cable Television Consumer Protection and Competition Act of 1992, and the prima facie standard established thereunder by the 2011 FCC Order, are content and speaker neutral and, thus, petitioners' First Amendment challenge warrants intermediate, rather than strict, scrutiny. The challenged program carriage regime satisfies intermediate scrutiny because its case-specific standards for identifying affiliation-based discrimination (a) serve important

---

[18] In light of our decision to vacate, we do not reach the Cable Companies' substantive challenges to the standstill rule under the First Amendment, APA, and Communications Act, as these concerns may be obviated if the FCC does not re-promulgate the rule or if it proposes—or after comment adopts—a modified rule not presenting the problems raised in these challenges.

government interests in promoting competition and diversity in an industry still posing serious competitive risks, and (b) are narrowly tailored not to burden substantially more speech than necessary to further those interests.

2. The standstill rule promulgated by the 2011 FCC Order is substantive and, thus, subject to the notice-and-comment requirements of the APA. The FCC failed to comply with those requirements.

Accordingly, the petitions for review are DENIED IN PART, insofar as they raise a First Amendment challenge to the program carriage regime, and GRANTED IN PART, insofar as they raise an APA challenge to the standstill rule. The FCC's standstill rule is VACATED without prejudice to the agency's re-promulgating it consistent with the APA.